**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PHYLLIS KING, on behalf of herself and others similarly situated, | : : : | CASE NO. 1:25-cv-00105-RGA |
| Plaintiff, | : : | |
| v. | : : | **FIRST AMENDED COMPLAINT –** |
| | : | **CLASS ACTION** |
| BON CHARGE, an Australian company. | : : | |
| Defendant. | : : : | |

_____/

**DECLARATORY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES
REQUESTED**

**DEMAND FOR A JURY TRIAL**

Plaintiff, PHYLLIS KING ("Plaintiff"), individually and on behalf of all others similarly

situated, brings this action against Defendant, BON CHARGE ("Defendant") pursuant to the

Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C. §§ 227(c)(2) and (5). On personal

knowledge, investigation of counsel, and on information and belief, Plaintiff alleges as follows:

## NATURE OF ACTION

1.       This dispute concerns a multi-year telemarketing text message campaign by an

Australian "wellness" company targeting thousands of United States-based customers in violation

of the TCPA.

2.       Between February 2021 and September 2024 Defendant, or agents acting on its

behalf, sent at least 121 telemarketing text messages to Plaintiff's personal cellular telephone for

the purpose of selling its products to Plaintiff. Defendant[1] sent such text messages without

---

[1] Plaintiff's allegations regarding conduct by Defendant throughout this First Amended Complaint should be read to include the alternative theory that the conduct was by agent(s) of Defendant acting on Defendant's behalf.

Plaintiff's prior express written consent, and despite Plaintiff's telephone number having been registered on the national do-not-call registry for most of this time period.

3.      What's more, at least 23 of Defendant's telemarketing text messages to Plaintiff violated the TCPA's Quiet Hours Provision, which required Defendant to restrict telephone solicitations to between 8 a.m. and 9 p.m. based on "local time at the called party's location." 47 C.F.R. § 64.1200(c)(1).

4.      Plaintiff brings this action for injunctive relief and statutory damages arising out of and relating to Defendant's conduct in negligently, knowingly, and/or willfully initiating more than one telemarketing telephone call/text message within a 12-month period to Plaintiff and class members on their residential telephone lines which have been registered on the national do-not-call registry, without prior express consent, and negligently, knowingly, and/or willfully initiating a telephone solicitation to Plaintiff and class members on their residential telephone lines before the hour of 8 a.m. and 9 p.m., based on local time at the called party's location, in violation of 47 U.S.C. §§ 227(c)(2) and (5) and 47 C.F.R. §§ 64.1200(c)(1) and (2).

## PARTIES

5.      Plaintiff is an individual residing in Smyrna, Kent County, Delaware since 2019.

6.      Defendant is a for-profit business organized under the laws of Australia with the Australian Business Number 38 472 469 810 and a principal place of business located at 2/40 King Edward Road, Osborne Park, 6017, Western Australia, Australia.

## BACKGROUND REGARDING DEFENDANT'S BUSINESS

7.      Defendant operates an online only store purporting to specialize in "premium, science-backed technology designed to enhance sleep, recovery, beauty, and overall wellness."[2]

---

[2] https://boncharge.com/

8.      Defendant's product range includes, *inter alia*, night-time blue light blocking glasses, sleep masks, red light therapy devices, light sensitivity glasses, daytime computer glasses, infrared sauna blankets and domes, and EMF/5G radiation blocking products. Defendant's products are expensive, ranging anywhere from $400 sleep masks to $2400 red light therapy blankets and $3400 infrared sauna domes.

9.      Defendant markets, sells, and ships its products globally, including, *inter alia*, to the United States, the United Kingdom, the member states of the European Union, and Australia.

10.     Since starting its business less than a decade ago, Defendant has seen a meteoric rise in sales, and an equally quick accumulation of wealth by its founders. As of May 2024 Defendant sold over 330,000 products to over 180,000 customers in 135 countries, for gross retail sales likely in the hundreds of millions of dollars.[3]

11.     According to a recent LinkedIn post by Defendant's CEO, Andy Mant, Defendant has "seen incredible growth" over "the last few years" since 2020.[4] In addition to its offices in Western Australia, Defendant opened a high rise office in a luxurious Sydney building and has a full executive team. Defendant's Chief Marketing Officer, Zoe Phillips, noted Defendant's new office is "better than some spas [she's] been to!"[5]

12.     LinkedIn shows Defendant employs: a Chief Operating Officer who once worked as a senior director for adidas; a Chief Technical Officer who previously worked as a senior director for The Estée Lauder Companies, Johnson & Johnson, and Pfizer; a Chief Marketing Officer; a Global Director of Public Relations; a Chief Visionary Officer; a Creative Director; a

---

[3] https://lux-life.digital/simply-and-effectively-charging-up-your-wellness/
[4] https://www.linkedin.com/posts/andy-mant-a19800297_we-are-open-katie-mant-what-an-incredible-activity-7313117732457042329 6-
7aVs/?utm_source=share&utm_medium=member_desktop&rcm=ACoAAAHcSSkBjifEN615BBT8LSS-
VDvFj9qCIyQ
[5] *Id*.

Senior Partnerships Assistant; an Operations Team Lead; a Logistics Coordinator; a Customer Experience Professional; and a Customer Service Coordinator.[6] Defendant is currently looking to hire a Senior Scientific Affairs and Marketing Compliance Officer, a Social Media and Community Manager, a CRM Specialist, a Content Director, and a Marketing Project Manager.[7]

13.     On March 27, 2025, Defendant's CEO, Andy Mant, submitted the Declaration of Andy Mant in Support of Defendant's Motion to Dismiss. *See* Mar. 27, 2025 Dec. of Andy Mant in Supp. Of Def.'s Mot. to Dismiss, ECF No. 14 (hereafter, the "Mant Dec."). In his declaration, Mr. Mant, "under penalty of perjury," attempts to paint a picture of Defendant as a "small, family-run" mom-and-pop shop operating from their "home" in "the most isolated metropolitan area on earth." Mant Dec. at ¶¶ 2, 5, 9. As alleged herein, nothing can be further from the truth.  In an interview more than five years ago, when Defendant's business was just picking up, Katie Mant, Mr. Mant's wife and co-owner of the business, stated, "It's all too easy, when the money starts coming in, to spend it thinking, 'I'm a millionaire. I can live the rich life now.' Then you have no money to invest back into the business."  Since then, however, Mr. and Mrs. Mant have tried to build Bon Charge's brand around Mr. and Mrs. Mant's extravagant displays of wealth in an attempt to become a luxury wellness brand.

14.     Mr. and Mrs. Mant's social media accounts, such as Instagram, are primarily used to promote Defendant's Bon Charge business.  Given that Defendant tries to attract a wealthy demographic and become a household, luxury name-brand, Defendant's social media strategy intentionally flaunts the lavish and extravagant jet-setting lifestyle of its founders Mr. and Mrs.

---

[6] https://www.linkedin.com/company/boncharge/people/
[7] *See* https://www.linkedin.com/jobs/search/?currentJobId=4204341806&f_C=18862414&geoId=92000000&origin=COMPANY_PAGE_JOBS_CLUSTER_EXPANSION&originToLandingJobPostings=4204341806%2C4205253419%2C4204341742%2C4204343506%2C4204340411

Mant. Indeed, Mr. and Mrs. Mant's Instagram accounts, and the official Instagram account of Bon Charge, emphasizes Mr. and Mrs. Mant jet-setting across time zones around the planet to luxury destinations, with frequent trips to the U.S. to promote Defendant's business (e.g., Santa Monica, California, Miami, Florida, and Washington, DC, for example), lavish trips abroad to other countries (e.g., multiple trips to Paris and London, Mauritius, Seychelles, Dubai, South Africa, Grand Cayman, Fiji, Ubud, Sydney, Auckland, Queenstown, Dorset, Wales, Menorca, Mallorca, Ibiza, Bali, Athens, Mykonos, Naxos, Santorini, etc.), stays at luxury properties like the Ritz and Claridges, private jet charters with members of Defendant's executive team for "Business meeting[s]" , personal helicopter rentals, trips on luxurious yachts, stays at penthouses and luxury resorts, dining at some of the most exclusive and expensive restaurants in the world, orders of bottles of expensive champagne and wine, and flashing exclusively high-end luxury clothing, jewelry, handbags, and accessories., etc. The below images are just a sampling of hundreds of posts on Defendant's and its founders' social media accounts promoting the Bon Charge brand[8]:

---

[8] Plaintiff has attached a more complete sample of Defendant and its founders' social media accounts as Exhibit C to the Complaint.

**Mrs. Mant in first class drinking champagne *en route* to Dubai on a business trip:**



**Mrs. Mant commuting via helicopter on a business trip:**



**Mrs. Mant proudly displaying the fact that Mr. Mant ordered the only bottle of Dom Perignon champagne at a high-end restaurant in Santa Monica, California during a July 2023 trip:**



**Ms. Mant flaunting a lifestyle of designer accessories, such as by Louis Vuitton on a trip to Los Angeles in June 2023:**



**Mrs. Mant on a yacht in Miami, Florida in June 2023, stating, "Ready for an afternoon yachting":**



15.     Not only does this further call into question Mr. Mant's representations about being a "small, family-run shop," it shows Mr. and Mrs. Mant are globetrotters, accustomed to travel to the U.S. for purposes of developing business on behalf of Defendant in the U.S.

16.     Mr. Mant's Declaration discusses the purported burden Defendant would endure if it were forced to travel "to the Unites States of America, specifically Delaware" because it would require "several long-haul flights, both ways, thousands of dollars in travel expenses, significant time away from hands-on management . . ., and take a tremendous physical toll of traveling through significant time-zone changes." *See* Mant Dec. at ¶ 23. Clearly, that is false.  Defendant's two cofounders are routinely in the United States on business (including on the East coast), travel via

first class, stay at the nicest hotels, and dine and spend without abandon when they are here. Defendant would not experience an undue burden from having to defend this action in Delaware.

## **DEFENDANT'S EXTENSIVE PRESENCE IN DELAWARE AND THE U.S.A**

17.     Defendant has continuous, pervasive, and systematic contacts with the State of Delaware, and transacts virtually all of its extensive business in the United States through Delaware corporations and agents.

18.     For instance, Defendant has registered its products with the U.S. Food and Drug Administration.[9] Defendant's website FAQs tries to lure United States consumers by advertising that "[a]ll our Red Light Therapy Devices are registered with the FDA" and "[o]ur Blue Light Blocking Glasses also hold FDA registration."[10]

19.     Mr. Mant and his wife have also secured various trademarks in the US for "Bon Charge" under their affiliated entity AND KAT HOLDINGS PTY LTD, a name referencing Mr. Mant's and Mrs. Mant's first names, Andy and Katie.[11]

20.     In what is perhaps the most glaring misrepresentation to the Court, Mr. Mant attempts to show Defendant does not direct marketing activities to United States consumers by stating Defendant's promotions "are for the global market, **not any one particular country** or state within a country." Mant Dec. at ¶ 8 (bolding added).

---

[9] *See, e.g.*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRL/rl.cfm?rid=281336; https://fda.report/Company/Blublox-Pty-L-T-D#google_vignette
[10] *See, e.g.*, https://boncharge.com/pages/faqs?srsltid=AfmBOooMu4WCywljhgTRuAsRqvyARjD5VNcsNikKlpGxNfSmKyE3w-0g#faq-red-light-therapy-devices; https://boncharge.com/pages/faqs?srsltid=AfmBOooMu4WCywljhgTRuAsRqvyARjD5VNcsNikKlpGxNfSmKyE3w-0g#faq-blue-light-glasses
[11] *See, e.g.*, https://trademark.justia.com/owners/and-kat-holdings-pty-ltd-5045575/; https://tsdr.uspto.gov/#caseNumber=97166511&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch

21.     Defendant's telemarketing text messages and advertising belie Mr. Mant's assertions. *See* Exhibit A. Defendant regularly sends U.S. consumers targeted, U.S.-specific telemarketing text messages, including text messages for Labor Day, 4th of July, and Thanksgiving/Black Friday sales. *See id*.

22.     What's more, Defendant directs telemarketing text messages to U.S. consumers promoting the HSA and FSA eligibility of its products. *See id*. ("Hi! Our products are now HAS/FSA eligible!"). Defendant's text messages even provide instructions for how US consumers can "get reimbursed from [their] pre-tax HSA/FSA and enjoy spending pre-tax money" on Defendant's products, and always include a link to its website so text message recipients can immediately shop. *See id*.

23.     Defendant's website has an entire landing page dedicated to helping U.S. consumers "save with [their] HAS/FSA funds . . . in partnership with Truemed."[12]   Defendant advertises it has "teamed up with Truemed to make [] wellness products eligible for Health Savings Account (HSA) or Flexible Spending Account (FSA) funds."[13]   On the same page, Defendant states, "Unfortunately, Truemed is currently only available in the United States." This is because HSAs and FSAs are specific to the U.S. and governed by U.S. tax laws. Mr. Mant's contention that Defendant does not direct marketing efforts to "any one particular country" is a complete falsehood. *See* Mant Dec. at ¶ 8.

24.     Defendant contracts with Truemed to provide U.S. consumers with letters of medical necessity from individual licensed practitioners to facilitate U.S. consumers' ability to use

---

[12] *See* https://boncharge.com/pages/hsa-fsa?srsltid=AfmBOoqqA8Cmx-4nQgTvYY1XJ2ZNtG-HbqlDcqIRkf0HnB2kR3j5vPde
[13] *Id*.

their HSA/FSA funds on Defendant's wellness products.[14] Truemed—formally True Medicine, Inc.—is an active Delaware corporation with a registered agent in Wilmington, Delaware, as reported on Delaware's Department of State: Division of Corporations website. For this and the below reasons, Defendant's contention that it has no true connection to Delaware is yet another falsehood.

25.     Mr. Mant's Declaration alludes to Defendant's reliance on "business partners and vendors to automate certain functions and provide certain key services," without disclosing that Defendant's entire U.S. operation depends on at least five Delaware agents with whom Defendant contracts. *See* Mant Dec. at ¶ 9.

26.     For example, Mr. Mant admits Defendant "has used two SMS marketing platform providers, Postscript iO and Klaviyo" to "send company communications from Bon Charge" to U.S. consumers. *Id.* at ¶ 11. Mr. Mant admits Postscript iO and Klaviyo "allow[ed Defendant] to communicate with customers and potential customers through text messaging to help drive interest in products, sales, and revenue." *Id.* at ¶ 10.[15]

27.     Mr. Mant glaringly omits the fact that both Stodge Inc. d/b/a PostScript.io and Klaviyo, Inc. are active Delaware corporations with registered agents in Wilmington, Delaware, as reported on Delaware's Department of State: Division of Corporations website. Thus, the two agents who facilitated Defendant's TCPA violations in this case are both Delaware corporations with whom Defendant contracted for telemarketing services.

---

[14] *See* https://boncharge.com/pages/hsa-fsa?srsltid=AfmBOoqqA8Cmx-4nQgTvYY1XJ2ZNtG-HbqlDcqIRkf0HnB2kR3j5vPde.

[15] Mr. Mant's representations establish that all text message communications at issue in this case, whether sent directly by Defendant or on behalf of Defendant by agents like Klaviyo and Postscript iO, were communications "from" Defendant between it and "potential customers."

28.     What's more, Defendant contracts with a Delaware corporation to fulfill **all** of its United States orders, including to customers ordering products from Delaware.[16] Defendant's "Terms of Supply of Products" on its website state that orders placed through Defendant's website are fulfilled by With Reach (USA), LLC.[17] With Reach (USA) LLC is an active Delaware limited liability company, with a registered agent in Wilmington, Delaware, as reported on Delaware's Department of State: Division of Corporations website.

29.     Thus, through Defendant's Delaware agent, Defendant conducts all its United States-based business with respect to order fulfillment. Defendant delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in Delaware and the rest of the United States. Not only does Defendant deliver its products into the stream of commerce expecting Delaware purchases, but it has specifically established a Delaware-based fulfillment operation through With Reach (USA) LLC, and Delaware-based telemarketing campaigns through Postscript iO and Klaviyo. For a company claiming it does not transact business in Delaware, virtually *all* of its robust United States business is run through Delaware agents and corporations.

30.     Defendant also contracts with U.S. based influencers to market its products to U.S. consumers on social media and other channels, some of whom are Delaware entities.[18] Specifically, U.S. based affiliates "earn 15% commission" through promoting Defendant's products to their followers, and receive "ongoing support and coaching from [Defendant's] affiliate team to help [] make the most out of [their] new partnership".[19]

---

[16] *See* https://boncharge.com/pages/terms-conditions
[17] *See id*.
[18] https://boncharge.com/pages/boncharge-ambassador-programme?srsltid=AfmBOoogVrFT8hwFC4WLP7gqchbjEJIL5D_922GlLvWl2buUGAiXB_i6
[19] *See id*. ("Simply create content and promote BON CHARGE products on your social media page(s), blog, or mailing list. Refer people to BON CHARGE using your unique affiliate link.")

31.     In 2024, Defendant partnered with Erewhon to promote its products in the U.S. Exhibit B. Erewhon is a high-end health food and grocery store chain known for its organic, local, and sustainable food offerings, as well as its wellness products. It has become somewhat of a cultural phenomenon, and is often associated with celebrity sightings and trendy, expensive health foods and juices. Erewhon—formally Nowhere Holdco, LLC—is an active Delaware limited liability company, with a registered agent in Dover, Delaware, as reported on Delaware's Department of State: Division of Corporations website.

32.     Defendant regularly sells its products to Delaware customers and, as can be seen with Plaintiff, has had a multi-year telemarketing campaign that includes Delaware residents.

## JURISDICTION AND VENUE

33.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff brings this action pursuant to 47 U.S.C. § 227 *et seq*.

34.     Delaware's long-arm statute is broad, conferring personal jurisdiction over a foreign defendant when it "in person or through an agent: (1) Transacts any business or performs any character of work or service in the State; (2) Contracts to supply services or things in this State; (3) Causes tortious injury in the State by an act or omission in this State; (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State; (5) Has an interest in, uses or possesses real property in the State; or (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing."  10 Del. C. § 3104.

35.     Because TCPA violations are a *tort*, they fall within Delaware's long-arm statute on their own even without any additional contacts between Defendant and Delaware. *See, e.g., Doyle v. Matrix Warranty Solutions,* Inc., 679 F. Supp. 3d 42, 45 (D.N.J. June 26, 2023) ("But with the TCPA Congress created a tort action."); *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 777 (N.D.W.V. Mar. 29, 2017) ("The Fourth Circuit has recognized that the TCPA's prohibitions against robo-calls implicate privacy interests in seclusion. This tort claim has also often been applied to unwanted telephone calls. In essence, the TCPA can be seen as merely liberalizing and codifying the application of this common law tort to a particularly intrusive type of unwanted telephone call.") (internal citations omitted).

36.     Defendant also regularly transacts business in Delaware through its numerous agents, who are all Delaware entities. Defendant regularly solicits business and derives substantial revenue from Delaware and the United States, and contracts to supply products in Delaware and the United States. Moreover, Defendant directs its marketing efforts to Delaware and the United States. Defendant purposely targeted Plaintiff – a Delaware resident for the entire period of Defendant's multi-year telemarketing campaign – to sell products to her in Delaware. Consumers can purchase items directly from Defendant's website to be shipped to their residences in Delaware. To the extent a customer is not happy with an order, Defendant accepts returns of items from Delaware residents, and also offers direct refunds to customers in Delaware.[20] Defendant offers to add insurance to orders placed through its website, including for Delaware customers.[21] Defendant states it "covers duties and taxes into the USA for all our customers," including Delaware residents.[22] The presence of numerous online reviews from United States customers

---

[20] https://boncharge.com/pages/shipping-returns
[21] *See id*.
[22] *See id.*

confirms Defendant has sold and shipped its products to United States consumers, including Delaware residents.[23] These business activities are sufficient to establish personal jurisdiction.

37.     Both telemarketing vendors with whom Defendant contracted to carry out its text message telemarketing campaign are incorporated in Delaware.

38.     Finally, Defendant purposefully availed itself to the Delaware marketplace by directing its telemarketing messages and calls to Delaware and to Plaintiff's cellular telephone, which is located in Delaware where Plaintiff resides.

39.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the telemarketing calls and texts that are the subject of this lawsuit were made to Plaintiff while she was a resident of and present in this District.

## TCPA BACKGROUND

40.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

### A.     The National Do-Not-Call Registry

41.     47 U.S.C. § 227(c) of the TCPA requires the Federal Communications Commission ("FCC") to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

---

[23] *See, e.g.*, https://www.trustpilot.com/review/www.blublox.com; https://us.amazon.com/BLUblox-Parker-Sleep-Blocking-Glasses/dp/B08FQ3VW31#averageCustomerReviewsAnchor.

42.     The national do-not-call registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

43.     A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

44.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the national do-not-call registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are made. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

45.     The FCC has issued rulings clarifying that in order to obtain an individual's consent, a clear, unambiguous, and conspicuous written disclosure must be provided by the individual. 2012 FCC Order, 27 FCC Rcd. at 1839 ("[R]equiring prior written consent will better protect consumer privacy because such consent requires conspicuous action by the consumer—providing permission in writing—to authorize autodialed or prerecorded telemarketing calls. . . .").

## **FACTUAL ALLEGATIONS**

46.     Defendant is a "person" as the term is defined by 47 U.S.C. § 153(39).

47.     At no point has Plaintiff sought out or solicited information regarding Defendant's products or services prior to receiving the telemarketing text messages at issue.

48.     Plaintiff has never consented in writing, or otherwise, to receive telemarketing calls or text messages from Defendant. Plaintiff has never provided Defendant with her telephone number.

16

49.     In fact, throughout extensive prelitigation discussions which began in October 2024, first with Defendant's CEO, Andy Mant, and then with Defendant's counsel since November 2024, Defendant has not been able to find any evidence of Plaintiff's express written consent to telemarketing text messages in this matter.

50.     Plaintiff's cellular telephone number, 267-XXX-5114, is a residential telephone line.

51.     Plaintiff registered this telephone number on the national do-not-call registry on or around February 23, 2022.

52.     Despite this, Plaintiff received dozens of telemarketing text messages from Defendant more than 30 days after her telephone number was registered on the national do-not-call registry, including more than two within a 365 day period.

53.     In total, Defendant sent *at least* 121 telemarketing text messages between February 2021 and September 2024, and possibly more text messages prior to February 2021 and/or after September 2024. *See* Exhibit A.

54.     The text messages marketed Defendant's products, promoted sales such as Defendant's Labor Day or Black Friday sale, offered discount codes, and promoted new product releases as Defendant's product line evolved and diversified throughout the years. *See id.* The text messages included common marketing tactics, such as language indicating urgency (e.g., "Last few hours" or "Last chance to save" or "Stock is selling out fast"), tiered discount structures (e.g., "Spend over $400 and save 30%"), and promotion of other benefits of buying Defendant's products (e.g., products' HSS/FSA eligibility). *See id.* Each text message asked Plaintiff to click on a link that would take her to Defendant's online store. *See id.*

55.     At least 23, and possibly more, of Defendant's marketing text messages were sent to Plaintiff's telephone outside the hours of 8 a.m. and 9 p.m. based on the local time where Plaintiff was located, which was Smyrna, Delaware.[24] *See id.* (upon information and belief, the timestamps in Exhibit A are in Coordinated Universal Time (UTC)).

56.     Plaintiff alleges direct liability because Defendant initiated the text messages to Plaintiff.

57.     In the alternative, Plaintiff alleges Defendant is vicariously liable for the text messages to Plaintiff because they were made by Defendant's agent(s) on Defendant's behalf. Defendant hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third-party telemarketers with whom Defendant contracted. Defendant had full control over these agents, provided them with the list of consumers and telephone numbers to target, the content of the telemarketing text messages, and the timing of when such messages should be sent.

58.     Plaintiff and all members of the class defined below have been harmed by the acts of Defendant because their privacy has been violated and they were subjected to annoying and harassing calls that constitute a nuisance. The calls also occupied Plaintiff's and class members' telephone lines, used up their time, and prevented them from receiving legitimate communications.

## CLASS ACTION ALLEGATIONS

59.     As authorized by Fed. R. Civ. P. 23(b)(2) or (b)(3), Plaintiff bring this action on behalf of a national class of all other persons or entities similarly situated throughout the United States.

60.     Plaintiff proposes the following class definitions, subject to amendment as appropriate:

---

[24] Plaintiff took a day trip to Philadelphia, Pennsylvania in spring 2021, but this is not material because she remained in the same time zone as Smyrna, Delaware throughout the trip.

**National Do-Not-Call Registry Class**: All persons in the United States whose numbers are listed on the national do-not-call registry, and who received two or more telemarketing calls or text messages within any 12-month period by or on behalf of Defendant or its agent to their residential telephone number 31 or more days after the telephone number was listed on the national do-not-call registry at any time in the period that begins four years before the filing of the complaint in this action to the date that class notice is disseminated (the "Class Period").

**Quiet Hours Class**: All persons in the United States whose telephone number was registered to an individual rather than a business and who received two or more calls or text messages within any 12-month period by or on behalf of Defendant or its agent to their residential telephone number either before 8:00 a.m. or after 9:00 p.m., at the time of the person's location, at any time during the Class Period.

61.     Plaintiff represents, and is a member of, the National Do-Not-Call Registry Class and the Quiet Hours Class (together, the "Classes"). Excluded from the proposed Classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, any person who made a transaction with Defendant in the preceding 18 months before receiving a telemarketing call or text message, any person who has executed a valid signed, written agreement between the person and Defendant which states that the person agrees to be contacted by Defendant and includes the telephone number to which the calls may be placed, any Judge and/or Magistrate Judge to whom this action is assigned, and any member of such Judges' staffs and immediate families.

62.     **Numerosity.** The potential members of the proposed Classes number at least in the thousands because of the *en masse* nature of telemarketing calls and text messages. Individual joinder of these persons is impracticable.

63.     **Existence and predominance of common questions of law and fact.** Plaintiff and all members of the proposed Classes have been harmed by the acts of Defendant, including, but

not limited to, multiple involuntary telephone and electrical charges, the invasion of their privacy, aggravation, annoyance, waste of time, the intrusion on their telephone that occupied it from receiving legitimate communications, and violations of their statutory rights.

64. The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

65. The proposed Classes, as defined above, are identifiable through telephone records and telephone number databases.

66. There are well defined and nearly identical questions of law and fact common to Plaintiff and members of the proposed Classes. The questions of law and fact involving the class claims predominate over questions which may affect individual members of the proposed class. These common questions of law and fact include, but are not limited to, the following:

     a.     whether Defendant systematically made multiple telephone calls and/or text messages to members of the proposed Classes;

     b.     whether Defendant made calls and/or text messages to Plaintiff and members of the proposed Classes without first obtaining prior express written consent to make the calls/texts;

     c.     whether Defendant made calls and/or text messages to Plaintiff and members of the proposed Classes either before 8:00 a.m. or after 9:00 p.m., at the time of the person's location in violation of the TCPA's quiet hours provision; and

     d.     whether members of the proposed Classes are entitled to treble damages and/or punitive damages based on the willfulness of Defendant's conduct.

67.     **Typicality.** Plaintiff's claims are typical of the claims of the proposed Classes because they arise out of the same common course of conduct by Defendant and are based on the same legal and remedial theories. Specifically, the proposed class members are persons who received telemarketing calls and text messages on their telephones without their prior express written consent, and some portion of these calls and text messages were outside of permissible hours. Plaintiff is a member of the proposed Classes and will fairly and adequately represent and protect the interests of the proposed Classes as she has no interests that conflict with any of the proposed class members.

68.     **Adequacy of Representation.** Plaintiff is an adequate representative of the proposed Classes because her interests do not conflict with the interests of the proposed Classes, she will fairly and adequately protect the interests of the proposed Classes, and she is represented by counsel skilled and experienced in class actions, including TCPA class actions.

69.     **Superiority.** Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns the identification of class members, which will be ascertainable from records maintained by Defendant.

70.     A class action is the superior method for the fair and efficient adjudication of this controversy. Class-wide relief is essential to compel Defendant to comply with the TCPA. The interests of individual members of the proposed Classes in individually controlling the prosecution of separate claims against Defendant are small because the damages in an individual action for violation of the TCPA are small. Management of these claims is likely to present significantly more difficulties than are presented in many class claims. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes

consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action.

71.     Defendant acted on grounds generally applicable to the proposed Classes, thereby making final injunctive relief and corresponding declaratory relief with respect to the proposed class appropriate on a class-wide basis. Moreover, on information and belief, Plaintiff alleges Defendant's telephone solicitation calls and/or text messages that are complained of herein are substantially likely to continue in the future if an injunction is not entered.

**FIRST CAUSE OF ACTION**
**Telephone Consumer Protection Act**
**Violations of 47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(c)**
**(On Behalf of Plaintiff and the National Do-Not-Call Registry Class)**

72.     Plaintiff repeats her prior allegations of this Complaint from paragraphs 1-71 and incorporates them by reference herein.

73.     The foregoing acts and omissions of Defendant constitute numerous and multiple violations of the TCPA, by making telemarketing calls and/or text messages, except for emergency purposes, to Plaintiff and members of the National Do-Not-Call Registry Class despite their numbers being on the national do-not-call registry in violation of 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2).

74.     Defendant's violations were willful or knowing.

75.     As a result of Defendant's violations, Plaintiff and members of the National Do-Not-Call Registry Class are entitled to treble damages of up to $1,500 for each call and text message made in violation of the TCPA pursuant to 47 U.S.C. § 227(c)(5).

76.     Plaintiff and the members of the National Do-Not-Call Registry Class are also entitled to and do seek injunctive relief prohibiting Defendant from making telemarketing calls

and text messages to telephone numbers registered on the national do-not-call registry, except for emergency purposes, in the future pursuant to 47 U.S.C. § 227(c)(5)(A).

77.    Plaintiff and members of the proposed National Do-Not-Call Registry Class are also entitled to an award of attorneys' fees and costs.

<u>**SECOND CAUSE OF ACTION**</u>
**Telephone Consumer Protection Act**
**Violations of 47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(c)**
**(On Behalf of Plaintiff and the National Do-Not-Call Registry Class)**

78.    Plaintiff repeats her prior allegations of this Complaint from paragraphs 1-77 and incorporates them by reference herein.

79.    The foregoing acts and omissions of Defendant constitute numerous and multiple violations of the TCPA, by making telemarketing calls and/or text messages, except for emergency purposes, to Plaintiff and members of the National Do-Not-Call Registry Class despite their numbers being on the national do-not-call registry in violation of 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2).

80.    As a result of Defendant's violations, Plaintiff and members of the National Do-Not-Call Registry Class are entitled to an award of $500 in statutory damages for each call and text message made in violation of the TCPA pursuant to 47 U.S.C. § 227(c)(5).

81.    Plaintiff and the members of the National Do-Not-Call Registry Class are also entitled to and do seek injunctive relief prohibiting Defendant from making telemarketing calls and text messages to telephone numbers registered on the national do-not-call registry, except for emergency purposes, in the future pursuant to 47 U.S.C. § 227(c)(5)(A).

82.    Plaintiff and members of the proposed National Do-Not-Call Registry Class are also entitled to an award of attorneys' fees and costs.

## THIRD CAUSE OF ACTION
### Telephone Consumer Protection Act
### Violations of 47 U.S.C. § 227(c)(2) & 47 C.F.R. § 64.1200(c)(1)
### (On Behalf of Plaintiff and the Quiet Hours Class)

83.     Plaintiff repeats her prior allegations of this Complaint from paragraphs 1-82 and incorporates them by reference herein.

84.     The TCPA delegates rulemaking to the FCC.

85.     The FCC's regulations provide in relevant part that "no person or entity shall initiate any telephone solicitation to: Any residential telephone subscriber before the hours of 8 a.m. or after 9 p.m. (local time at the called party's location). 47 C.F.R. § 64.1200(c)(1).

86.     Defendant sent telemarketing text messages to Plaintiff that were received before 8:00 a.m. or after 9:00 p.m. despite Plaintiff having an area code in the Eastern U.S. time zone, despite Plaintiff residing in Smyrna, Delaware at all relevant times, and despite Plaintiff being physically present in Delaware at all relevant times, apart from one day trip to Philadelphia, Pennsylvania in spring 2021.

87.     The calls before 8:00 a.m. or after 9:00 p.m. made to Plaintiff and the Quiet Hours Class were in violation of 47 C.F.R. § 64.1200(c)(1).

88.     As a result of the above violations of the TCPA, Plaintiff has suffered the losses and damages as set forth above entitling Plaintiff to an award of statutory, actual, and treble damages for each text message in violation of the TCPA pursuant to 47 U.S.C. § 227(c)(2).

89.     Plaintiff and members of the proposed Quiet Hours Class are also entitled to an award of attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed class, prays for the following relief:

A.   Certification of the proposed Classes;

B.   Appointment of Plaintiff as representative of the Classes;

C.   Appointment of the undersigned counsel as counsel for the Classes;

D.   A declaration that Defendant's actions complained of herein violated the TCPA;

E.   An order enjoining Defendant from making telemarketing calls and text messages to numbers on the national do-not-call registry, absent an emergency circumstance;

F.   An award to Plaintiff and the Classes of damages, as allowed by law;

G.   An award of attorneys fees, expenses, and costs; and

H.   Orders granting such other and further relief as the Court deems necessary, just, and proper.

## <u>JURY DEMAND</u>

Plaintiff requests a jury trial on all issues so triable.


Dated: April 10, 2025                    Respectfully  submitted,

                                         */s/ R. Grant Dick IV*
                                         R. Grant Dick IV
                                         COOCH AND TAYLOR P.A.
                                         1000 N. West Street, Suite 1500
                                         Wilmington, DE 19801
                                         Telephone: 302-984-3800
                                         E-Mail: gdick@coochtaylor.com

                                         Yeremey O. Krivoshey (SBN 295032)
                                         SMITH KRIVOSHEY, PC
                                         (*pro hac vice*)
                                         166 Geary Str STE 1500-1507
                                         San Francisco, CA 94108
                                         Telephone: 415-839-7077
                                         Facsimile: (888) 410-0415
                                         E-Mail: yeremey@skclassactions.com

Aleksandr "Sasha" Litvinov (SBN 95598)
SMITH KRIVOSHEY, PC
(*pro hac vice*)
867 Boylston Street 5th Floor #1520
Boston, MA 02116
Telephone: 617-377-7404
Facsimile: (888) 410-0415
E-Mail: sasha@skclassactions.com

*Attorneys for Plaintiff*
*and the Proposed Class*