

October 31, 2025

The Honorable Stephanos Bibas
U.S. Court of Appeals for the Third Circuit
601 Market Street
Philadelphia, PA 19106

RE: *King v. Bon Charge*, Civ. No. 25-00105-SB (D. Del.)

Dear Judge Bibas:

I submit this amicus letter brief pursuant to the Court's order of August 26, 2025 (D.I. 30). The Court should deny defendant Bon Charge's motion to dismiss the amended complaint of plaintiff Phyllis King (D.I. 17). King's service of the summons was effective to establish personal jurisdiction under Rule 4(k)(2). In particular, exercising jurisdiction in this action is "consistent with the United States Constitution and laws," Fed. R. Civ. P. 4(k)(2)(B), whether under the caselaw predating *Fuld v. Palestine Liberation Org.*, 145 S. Ct. 2090 (2025), under the broader test applied by the Supreme Court in *Fuld*, or under the still-broader standards originally applicable as a matter of Congress's enumerated powers and the Fifth Amendment's Due Process Clause.

1. **Rule 4(k)(2) authorizes jurisdiction in this case unless the Constitution forbids it.**

Personal jurisdiction is available in this Court under Rule 4(k)(2) if it is available at all. Rule 4(k)(2) was adopted in response to *Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97 (1987), in which third-party defendants to a federal claim escaped federal jurisdiction because they fell

outside the personal jurisdiction of any single state. *See id.* at 104–11. The Supreme Court suggested that a new statute or rule might patch this gap in the law, *id.* at 111, and Rule 4(k)(2) did so in 1993, *see* Fed. R. Civ. P. 4(k)(2) advisory committee note (1993).

As in *Omni Capital*, this case involves a federal claim against a foreign defendant. Bon Charge or its agents allegedly sent marketing messages to American phone numbers, among them the Pennsylvania-area number King uses in Delaware. *See* Am. Compl. ¶¶ 21–22, 55–57 (D.I. 16). King alleges that these messages were sent without her consent and despite her inclusion in the federal do-not-call registry, contrary to the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227. Am. Compl. ¶¶ 47–58, 72–89 (D.I. 16). These TCPA claims plainly "arise[] under federal law," Fed. R. Civ. P. 4(k)(2), so if Bon Charge "is not subject to jurisdiction in any state's courts of general jurisdiction," *id.* 4(k)(2)(A), then the Court may exercise jurisdiction if it is "consistent with the United States Constitution and laws," *id.* 4(k)(2)(B).

It is possible that this case fails Rule 4(k)(2)(A)'s no-state-jurisdiction requirement. Perhaps Bon Charge could be haled before a Delaware state court, given its alleged arrangements with Delaware entities, *see* Am. Compl ¶¶ 25–31 (D.I. 16). If so, the Court may exercise jurisdiction under Rule 4(k)(1)(A). Or perhaps sending text messages to a Pennsylvania number establishes minimum contacts with Pennsylvania—as "[d]istrict courts across the country" have held. *See Perrong v.*

*Chase Data Corp.*, Civ. No. 22-2638, 2024 WL 329933, at *3 n.2 (E.D. Pa. Jan. 26, 2024) (quoting *Abramson v. CWS Apartment Homes, LLC*, No. 16-426, 2016 WL 6236370, at *4 n.47 (W.D. Pa. Oct. 24, 2016)). If so, the Court might transfer the action under 28 U.S.C. § 1404(a) to the Eastern District of Pennsylvania, where the action "might have been brought," *id.*, with venue laid under § 1391(b)(1) (as Bon Charge, an entity defendant, might "reside" there under § 1391(c)(2) and (d)).

The Court need not resolve these questions. Bon Charge states that it "may be difficult to identify where in the United States Bon Charge could be subject to any state's courts of general jurisdiction"; indeed, that "any exercise of personal jurisdiction [in the United States] would violate the due process afforded by the Constitution." Def's. Reply Br. Supp. Mot. Dismiss Am. Compl. 2, 8 (D.I. 26) [hereinafter MtD Reply]. A party's concession on a question of law does not bind a court, *see Est. of Sanford v. Comm'r*, 308 U.S. 39, 51 (1939), but there is good reason not to look past this one. Although some district courts expect plaintiffs to establish the absence of jurisdiction in every state court, *see, e.g., Adtile Techs. Inc. v. Perion Network Ltd.*, 192 F. Supp. 3d 515, 524 (D. Del. 2016); *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636, 647–48 (D. Del. 2006), the Third Circuit does not appear to have said so, and other circuits more sensibly expect defendants, once the issue is raised, to explain how Rule 4(k)(2)(A) might *not* be satisfied. *See, e.g., ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001) (describing a separate "analysis for each of

the 50 states" as unnecessary, for "[a] defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed"); *United States v. Swiss Am. Bank, Ltd.*, 191 F.2d 30, 42 (1st Cir. 1999); *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004); *Lyngaas v. Curaden AG*, 992 F.3d 412, 422 (6th Cir. 2021); *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1294 (Fed. Cir. 2012); *cf.* Wright & Miller, Federal Practice and Procedure § 1068.1 (approving this approach). Given its concession, Bon Charge should be assumed for Rule 4(k)(2) purposes to be exempt from jurisdiction in the courts of any particular state. Otherwise it might win coming and going, contesting jurisdiction in *each* state under Rule 4(k)(1)(A) but not in *every* state under Rule 4(k)(2)—and the case might fall through the very cracks the Supreme Court patched in 1993.

2. **The Constitution permits this Court to exercise jurisdiction under Rule 4(k)(2).**

Given Bon Charge's interactions with the United States, personal jurisdiction would be constitutional even under the pre-*Fuld* view of the Fifth Amendment, which mirrored the limits on state courts. *A fortiori*, jurisdiction is allowed under the broader standards applied in *Fuld*. As the original standards were broader still, there is no reason to deny jurisdiction here.

a. **Jurisdiction is constitutionally permissible under pre-*Fuld* standards.**

Before *Fuld*, many courts thought the Fifth Amendment test largely "mirror[ed] the Fourteenth Amendment test," *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 234, 238–

39 n.22 (5th Cir. 2022)—under which the defendant must have created "minimum contacts" with the forum by "purposefully avail[ing] itself of the privilege of conducting activities" there, *Fuld*, 145 S. Ct. at 2103 (citations and internal quotation marks omitted), the suit must "arise out of or relate to the defendant's contacts," *Bristol-Myers Squibb Co. v. Super. Ct.*, 582 U.S. 255, 262 (2017) (alterations, citations, and internal quotation marks omitted), and jurisdiction must be "fair[]" and "reasonable[]," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)—except that the inquiry "look[ed] at contacts with the United States as a whole." *Douglass*, 46 F.4th at 234.

That standard is satisfied here. By its own admission, Bon Charge "used PostScript iO * * * for automating and sending SMS text messages to individuals in the United States"; it then "changed its provider * * * to Klaviyo * * * for SMS text messaging in the United States." Def's. Br. Supp. Mot. Dismiss Am. Compl. at 4–5 (D.I. 18). Bon Charge's efforts to send commercial messages into the United States reflect purposeful availment of the privilege of conducting activities here, creating contacts with the nation as a whole, from which the present suit arises. *Cf. Walden v. Fiore*, 571 U.S. 277, 289 (2014) (discussing whether a defendant "contacted anyone in[] or sent anything * * * to Nevada"); *State v. Carter*, 27 N.J. (3 Dutcher) 499, 500 (Sup. Ct. 1859) (noting that the sending of a "missile, or letter, or message" traditionally "operated as an act within this state"). Bon Charge argues strenuously that jurisdiction in a U.S. court would not be fair and reasonable, MtD Reply

4–8 (D.I. 26), but such claims are hard to credit. "[T]he burden on the defendant" must "be considered in light of other relevant factors," among them "the forum State's interest in adjudicating the dispute" and "the plaintiff's interest in obtaining convenient and effective relief." *Volkswagen*, 444 U.S. at 292; *accord Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 179 (3d Cir. 2006). Bon Charge is far more able to litigate in the United States than King is able to litigate in Australia, and the United States has an obvious interest in adjudicating whether its laws have been violated and its citizens irritated by text messages. (Bon Charge contends that its messages were not unsolicited, MtD Reply 6, 8 (D.I. 26), but this goes to the merits, not jurisdiction.) As the Court noted in *Volkswagen*, when a "manufacturer or distributor" makes efforts "to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." 444 U.S. at 297. The same reasoning applies to distributors of text messages.

      b.  **Jurisdiction is constitutionally permissible under the standards of *Fuld*.**

*Fuld* held the permissible scope of federal jurisdiction under the Fifth Amendment to be strictly broader than that of state jurisdiction under the Fourteenth, and these broader standards apply under Rule 4(k)(2). Rather than mirror the "familiar Fourteenth Amendment framework," 145 S. Ct. at 2103, *Fuld* insisted on "a more flexible jurisdictional inquiry commensurate with the

Federal Government's broader sovereign authority," *id.* at 2105. *Fuld* permitted a federal lawsuit against foreign defendants who would have been impossible for any state to reach, even a state the size of all fifty combined. In *Walden*, the intentional tort against a Nevada resident had taken place wholly outside Nevada, and the Fourteenth Amendment placed the action equally outside the jurisdiction of Nevada's courts, *see* 571 U.S. at 289–92; yet the *Fuld* litigation, arising from attacks on U.S. citizens wholly outside the United States, was permitted to be heard in U.S. courts, *see* 145 S. Ct. at 2099. Moreover, in discussing the possibility that the Fifth Amendment imposed a fair-and-reasonable requirement akin to that of the Fourteenth, the *Fuld* Court presupposed that those factors were no *more* exacting. *See id.* at 2109–10.

Indeed, the broader test may be more appropriate here. True, preventing text-message spam, unlike "[c]ombating terrorism," is not "an urgent objective of the highest order." *Fuld*, 145 S. Ct. at 2107 (citation and internal quotation marks omitted). Yet Rule 4(k)(2) reflects a judgment by Congress—which authorized the rule's promulgation after congressional review, *see* 28 U.S.C. §§ 2072(a), 2074(a)—that the full vindication of federal rights requires the broadest jurisdiction over foreign defendants not otherwise amenable to American courts. If Bon Charge had sent text messages with malware, damaging Americans' devices or stealing their information, Congress would have had an interest akin to that in *Fuld* (though not as "compelling") "in providing a forum

for American victims to hold the perpetrators of such acts accountable." 145 S. Ct. at 2109. The decision to patch *completely* the *Omni Capital* gap is as much a "considered judgment," if not a "narrow" one, as Congress's more targeted efforts to combat terrorism. *Id.* at 2107.

Rule 4(k)(2), moreover, invokes the actual standards of the Due Process Clause, not the state-mirroring test. It patches the *Omni Capital* gap by providing a forum for federal claims against otherwise-unreachable defendants *whenever* such jurisdiction is "consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2)(B). The drafters surely assumed that the state-mirroring test might apply, *see id.* advisory committee note (1993) (discussing "affiliating contacts with the United States"). But rather than permit jurisdiction only "as far as the Fifth Amendment *then* allowed," as some argue, Kevin M. Clermont, *Fuld*'s Fifth Amendment 8 (Aug. 4, 2025), http://ssrn.com/id=5357403 (emphasis added), the drafters' assumptions were just that: assumptions. They cannot "change the meaning that the Rules would otherwise bear," *Tome v. United States*, 513 U.S. 150, 168 (1995) (Scalia, J., concurring in part and concurring in the judgment), let alone the demands of the Fifth Amendment—which "then allowed" as much jurisdiction as it allows now, even if the courts' *understanding* of what it allows has changed. (Indeed, why should the same static reading not apply to Rule 4(k)(1)(A)'s reference to defendants "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located,"

requiring courts to disregard *Daimler AG v. Bauman*, 571 U.S. 117 (2014), or *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028 (2023), as departing from standards frozen in amber decades before?) Unlike, say, the venue statutes, which look to "contacts * * * sufficient [for] personal jurisdiction," 28 U.S.C. § 1391(d), or the habeas statutes, which look to constitutional meaning "as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), Rule 4(k)(2) neither echoes a particular interpretation of the Constitution nor incorporates the views of a particular interpreter thereof. It requires only that jurisdiction not contravene the *actual* "United States Constitution and laws."

### c. Jurisdiction is permissible under the actual Fifth Amendment.

As it had in *Omni Capital*, 484 U.S. at 102 n.5, and *Bristol-Myers Squibb*, 582 U.S. at 269, the Supreme Court in *Fuld* left open the full scope of federal personal jurisdiction under the Fifth Amendment, *see* 145 S. Ct. at 2106; *id.* at 2121 (Thomas, J., concurring in the judgment). Should it be necessary, this Court can address the question in the first instance. As an original matter, the Fifth Amendment did not impose its own limits on the personal jurisdiction of the federal courts. Rather, those limits were derived from rules of general and international law, which the United States has the sovereign power to disregard within its own courts. Should Congress enact statutes or authorize rules extending beyond those limits, as it did in *Fuld* and in Rule 4(k)(2), there is no constitutional ground on which a court of the United States could reject the exercise of jurisdiction.

At the Founding, personal jurisdiction was not a doctrine of due process. (Indeed, there seem to be no state or federal cases taking such a view until the Civil War. *See, e.g., Beard v. Beard*, 21 Ind. 321, 324 (1863); Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1723 & nn.123–125 (2020).) Instead, it was governed by "common law rules" and by "the law of nations," *Jenkins v. Putnam*, 1 S.C.L. (1 Bay) 8, 9–10 (1784) (per curiam), including "the well established rules of international law regulating governments foreign to each other"—which "our federal Constitution" or an "act of Congress" *could*, but *need not*, modify. *D'Arcy v. Ketchum*, 52 U.S. (11 How.) 165, 174 (1851); *see generally* Stephen E. Sachs, Pennoyer *Was Right*, 95 Tex. L. Rev. 1249, 1269–87 (2017). Typically these general-law rules were not enforced through Supreme Court review, for they did not pose federal questions. *See N.Y. Life Ins. Co. v. Hendren*, 92 U.S. 286, 286–87 (1875); *Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 18–19 (1842). Instead, if a sovereign told its courts to violate international law, the resulting judgment would not be "regarded by foreign courts," but enforced only "within the dominions of [that] prince," *Rose v. Himely*, 8 U.S. (4 Cranch) 241, 276–77 (1808) (Marshall, C.J.)—given effect within, though not "beyond[,] the domestic tribunals." Joseph Story, Commentaries on the Conflict of Laws § 586, at 492 (Boston, Hilliard, Gray & Co. 1834).

To the extent that jurisdictional rules were rules of general law or of the law of nations, those rules could be abrogated by statute, at least within (if not beyond) the courts of a given sovereign.

States *routinely* sought to extend their jurisdiction beyond accepted limits, and such statutes were recognized as fully applicable within the state's own courts, if not beyond them. *See, e.g.*, *D'Arcy*, 52 U.S. at 174 (accepting a jurisdictional defense that "could not have been made" in New York's courts); *Flower v. Parker*, 9 F. Cas. 323, 324–26 (C.C.D. Mass. 1823) (No. 4891) (Story, J.) (rejecting a Massachusetts judgment in federal court, though noting that he would "bow to th[e] decision" were it "litigated in the state courts"); *Steel v. Smith*, 7 Watts & Serg. 447, 451 (Pa. 1844) (rejecting a Louisiana judgment that "concludes the party in its own courts"); *Starbuck v. Murray*, 5 Wend. 148, 150, 152, 158 (N.Y. Sup. Ct. 1830) (reviewing another state's judgment, although both sides agreed that it was binding in that state's courts); *Bartlet v. Knight*, 1 Mass. 401, 410 (1805) (opinion of Sedgwick, J.) (rejecting a New Hampshire judgment but acknowledging that "many of the States, of which *this* is one," used precisely the same procedures). Several of these states even had due process clauses in their state constitutions, *see, e.g.*, N.Y. Const. of 1846, art. I, § 6, but no one seems to have thought that this mattered.

Congress, too, could override the law of nations when it so chose, with binding effect within (if not beyond) U.S. courts. Although no sovereign could *alter* or *exit* certain doctrines of the law of nations—which some have read as a limit on congressional power, *see, e.g.*, William S. Dodge, *Customary International Law, Congress and the Courts: Origins of the Later-in-Time Rule*, in

Making Transnational Law Work in the Global Economy 531, 534–35 (Pieter H.F. Bekker et al. eds., 2010)—a sovereign might always *disregard* such rules, however little that might be accepted abroad. *Cf. Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 229 (opinion of Chase, J.) (arguing that Virginia's violation of the law of nations was binding on Virginian courts); *id.* at 265–66 (opinion of Iredell, J.) (arguing that all constitutional statutes are "obligatory in the country subject to their own immediate jurisdiction"). Our Constitution makes "the Laws of the United States which shall be made in Pursuance thereof"—and not the law of nations—the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. That is why numerous Founding-era sources recognized Congress's power to contravene otherwise-binding rules of international law. *See, e.g., The Schooner Exch. v. M'Faddon*, 11 U.S. (7 Cranch) 116, 146–47 (1812); *accord The Marianna Flora*, 24 U.S. (11 Wheat.) 1, 39–40 (1826); *The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815).

That general principle applied in the specific context of jurisdiction. In *Picquet v. Swan*, Justice Story recognized that Congress might order "a subject of England, or France, or Russia * * * summoned from the other end of the globe to obey our process, and submit to the judgment of our courts"; such a statute might violate "principles of public law, public convenience, and immutable justice," but a federal court "would certainly be bound to follow it, and proceed upon the law." 19 F. Cas. 609, 613–15 (C.C.D. Mass. 1828) (No. 11,134). And the Court in *D'Arcy*, which found such

judgments "an illegitimate assumption of power" to be "resisted as mere abuse," suggested that they could still be enforced if an "act of Congress" had "altered the rule." 52 U.S. at 174. If the Fifth Amendment really did place important limits on personal jurisdiction, "now was the time to say so," Sachs, *Unlimited Jurisdiction*, 106 Va. L. Rev. at 1716—yet no Founding-era source ever did.

For state courts, the Fourteenth Amendment changed things by creating a new route to federal-question review. Previously federal courts could reexamine state jurisdiction only in diversity cases, *see, e.g., Flower*, 9 F. Cas. 323, or when federal law made it relevant, *see, e.g., Green v. Van Buskirk*, 72 U.S. (5 Wall.) 307, 314 (1867). But after the Fourteenth Amendment, as the Court recognized in *Pennoyer v. Neff*, a state's depriving a party of property based on a jurisdictionless judgment was a deprivation without due process, as proceedings against parties "over whom that court has no jurisdiction do not constitute due process of law." 95 U.S. 714, 733 (1878). The Fourteenth Amendment thus gave federal *teeth* to whatever law properly governed personal jurisdiction, rather than hiding specific jurisdictional rules inside the Constitution "as if in invisible ink." Sachs, Pennoyer *Was Right*, 95 Tex. L. Rev. at 1284, 1297–1306.

In federal courts, the situation was very different. The Judiciary Act of 1789 severely restricted their jurisdiction, ch. 20, § 11, 1 Stat. 73, 79, so there was rarely an occasion to test a federal judgment under the law of nations: any unusual judgment would be invalidated on statutory

grounds long before such questions arose. *See* Sachs, *Unlimited Jurisdiction*, 106 Va. L. Rev. at 1710–11. Had Congress passed a statute overriding the law of nations, it would have effectively *revised* the law of personal jurisdiction, and the Fifth Amendment's Due Process Clause would again have had no further work to do. That is what Congress did in the Rules Enabling Act, authorizing "rules of practice and procedure," 28 U.S.C. § 2072(a), including rules on effective service, *Miss. Pub'g Corp. v. Murphree*, 326 U.S. 438, 444–45 (1946); Sachs, *Unlimited Jurisdiction*, 106 Va. L. Rev. at 1743–66.

Cases like *Picquet* or *D'Arcy* do not establish, on their own, the scope of the Fifth Amendment. But they do shift the burden of proof for those scouring the historical record for some trace of due process limits on federal jurisdiction. Identifying the role of Fifth Amendment due process is necessarily "an exercise in proving a negative," Sachs, *Unlimited Jurisdiction*, 106 Va. L. Rev. at 1710, yet "[c]ourts prove negatives all the time, as they have to," Br. of Prof. Stephen E. Sachs as *Amicus Curiae* Supp. Pet'rs 7, *Fuld*, 149 S. Ct. 2090 (No. 24-20). Here the best evidence suggests that the Fifth Amendment—like the Fourteenth—did *not* impose substantive jurisdictional rules of its own, but rather relied on other sources of law, which Congress could provide.

The absence of due process limits on federal personal jurisdiction does not empty out Rule 4(k)(2)'s reference to the Constitution. Congress could not, for example, provide for worldwide service in cases outside its enumerated powers (say, state-law actions in state court) or contrary to

constitutional rights (say, for Christian plaintiffs only). But if Congress chooses to "carry[] into Execution" its other powers, U.S. Const. art. I, § 8, cl. 18, by providing for worldwide service on the causes of action it has used those powers to create, the Fifth Amendment will not get in the way.

The choice made by Congress and the Supreme Court to patch the *Omni Capital* gap, and to do so as completely as is constitutionally possible, was a far more significant choice than Rule 4(k)(2)'s drafters may have expected in 1993. That consideration is surely relevant to whether the Advisory Committee on Civil Rules should suggest a narrowing amendment. But it is not a relevant consideration to this Court, which must apply the law as it stands.

The motion to dismiss should therefore be denied.

Dated: October 31, 2025

Respectfully submitted,

/s/ Stephen E. Sachs
Stephen E. Sachs
Antonin Scalia Professor of Law
HARVARD LAW SCHOOL
1557 Massachusetts Ave., Lewis 311
Cambridge, MA 02138
(617) 495–5009
ssachs@law.harvard.edu