IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHYLLIS KING, on behalf of herself
and others similarly situated,

      *Plaintiff,*

      v.

BON CHARGE, an Australian
company,

      *Defendant.*

No. 25-cv-00105-SB

---

Robert Grant Dick, IV, COOCH & TAYLOR, P.A., Wilmington, Delaware; Aleksandr Litvinov, Yeremy Krivoshey, SMITH KRIVOSHEY, San Francisco, California.

*Counsel for Plaintiff.*

Alessandra Glorioso, Ashley Repp, Theresa M. Bevilacqua, DORSEY & WHITNEY (DELAWARE) LLP, Wilmington, Delaware.

*Counsel for Defendant.*

---

### MEMORANDUM OPINION

December 30, 2025, *as amended* April 30, 2026

BIBAS, *Circuit Judge*, sitting by designation.

"Americans passionately disagree about many things. But they are largely united in their disdain" for telemarketers. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 613 (2020) (opinion of Kavanaugh, J.). Phyllis King subscribed to marketing texts from an online wellness company so that she could get a discount code. When the company started texting her dozens of advertisements at all hours, she brought this putative class action under the federal Telephone Consumer Protection Act (TCPA or Act). The company

moved to dismiss for lack of personal jurisdiction and failure to state a claim. I deny the motion as to personal jurisdiction and partially grant it for failure to state a claim.

## I.   PHYLLIS KING SUBSCRIBES TO MARKETING TEXTS FROM BON CHARGE BUT THEN GETS FRUSTRATED

Bon Charge, originally called BluBlox, is an Australian online seller of wellness products. Am. Compl., D.I. 16 ¶¶ 6–7; D.I. 18 at 8. King is a Delawarean. Am. Compl. ¶ 5. On February 22, 2021, King texted a "keyword" to Bon Charge to "subscribe" to marketing messages and get a discount code for its online store. D.I. 16-1 at 2.

In the following months, King got "dozens of telemarketing text messages" advertising Bon Charge's products and sales promotions. Am. Compl. ¶ 52. Exasperated, King added her number to the federal Do-Not-Call Registry in early 2022. *Id.* ¶ 51. But the messages kept coming. Some of them came in the middle of the night or the early morning. *Id.* ¶ 55. King felt "annoy[ed]" and "harass[ed]" by the messages, but she did not unsubscribe until late 2024, when she finally texted Bon Charge "STOP." *Id.* ¶ 58 (first two quotations); D.I. 18 at 13 (third quotation). Bon Charge did not text King again after getting the "STOP" message. D.I. 18 at 13; Am. Compl. ¶ 2.

King then filed this putative class action against Bon Charge under the Act. *See* Compl., D.I. 1. She alleged that Bon Charge had violated the statute and its implementing regulations by continuing to text her even though her number was on the Do-Not-Call Registry. And she sought certification of a class of plaintiffs "whose numbers [were] listed on the national do-not-call registry, and who received two or more telemarketing calls or text messages within any 12-month period from [Bon Charge] or its agent[s] to their residential telephone number." *Id.* ¶ 26. After Bon

Charge moved to dismiss, King amended her complaint to bolster her allegations of personal jurisdiction and add a claim that Bon Charge had also violated a regulation forbidding advertisers to contact people during "quiet hours"—between 9 p.m. and 8 a.m. local time. *See* D.I. 12; Am. Compl. ¶¶ 7–32, 83–89.

Bon Charge again moved to dismiss for lack of personal jurisdiction, arguing that Delaware's long-arm statute did not cover its minimal activities in the state and that exercising jurisdiction would violate due process. *See* D.I. 18 at 15–22; Fed. R. Civ. P. 12(b)(2). It also moved to dismiss for failure to state a claim. *See* D.I. 18 at 23–25; Fed. R. Civ. P. 12(b)(6). King responded that she was not asserting personal jurisdiction under Delaware's long-arm statute and was instead using Rule 4(k)(2). D.I. 23 at 6. After the parties completed their briefing, the Supreme Court decided *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025). *Fuld* called the reasoning of prior cases applying Rule 4(k)(2) into question, so I appointed Professor Stephen Sachs of Harvard Law School as amicus curiae to advise the Court on *Fuld*'s impact. D.I. 30. Professor Sachs has ably discharged his duties, and I thank him for his service to the Court. *See* Sachs Br., D.I. 33. The parties also submitted supplemental briefing addressing *Fuld* and Professor Sachs's brief. D.I. 34–35.

Bon Charge's motion to dismiss is now ripe. In evaluating the motion, I take the well-pleaded allegations in King's complaint as true and draw all reasonable inferences in her favor. Fed. R. Civ. P. 12(b)(2), (b)(6).

## II.    THIS COURT HAS PERSONAL JURISDICTION

Generally, federal courts exercise personal jurisdiction under Rule 4(k)(1)(A), which provides that serving a summons establishes personal jurisdiction over a defendant if

the defendant would be subject to "the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A). A defendant is automatically subject to the jurisdiction of a state's courts if it is "essentially at home" in the state. *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014). Otherwise, Rule 4(k)(1)(A) requires a federal court to "borrow" the state's long-arm statute. If the long-arm would make an out-of-state defendant suable in state court, then the federal court can exercise personal jurisdiction too—subject to constitutional limits.

In unusual cases, however, a defendant (usually a foreign entity) will "f[a]ll outside the personal jurisdiction of any single state," making Rule 4(k)(1)(A) unavailable. Sachs Br. 1–2; *see also Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 105–06 (1987). To patch that gap, the Supreme Court adopted Rule 4(k)(2) in 1993. *See* Fed. R. Civ. P. 4 & advisory comm.'s n. to 1993 amend. Rule 4(k)(2) operates as a federal long-arm statute and provides that if (1) the plaintiff's claim arises under federal law, (2) the defendant is "not subject to jurisdiction in any state's courts of general jurisdiction," and (3) "exercising jurisdiction is consistent with the United States Constitution and laws," then serving a summons establishes personal jurisdiction over that defendant in any federal court. Fed. R. Civ. P. 4(k)(2). King has disclaimed any theory of personal jurisdiction under Rule 4(k)(1)(A). *See* D.I. 23 at 6. Instead, she says that this Court has jurisdiction under Rule 4(k)(2). *See id.* It does.

### A. King satisfies the first two prongs of Rule 4(k)(2), leaving only due process

The parties do not dispute that King's TCPA claims arise under federal law. D.I. 23 at 8; D.I. 26 at 5. And Bon Charge concedes that it "may be difficult to identify

4

where in the United States [it] could be subject to any state's courts of general jurisdiction." D.I. 26 at 5. Later, in its supplemental brief, Bon Charge argued that its concession was not enough, and that under Third Circuit precedent, King must affirmatively show that Bon Charge could not be sued in any state's courts to invoke Rule 4(k)(2). D.I. 35 at 10. But Bon Charge misunderstands things.

There is a circuit split on which party has the burden to show that a defendant is "not subject to jurisdiction in any state's courts of general jurisdiction." Fed. R. Civ. P. 4(k)(2). As Bon Charge correctly observes, some circuits require the plaintiff to prove that a defendant could not be sued in any of the fifty states. *See, e.g.*, *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory,"* 283 F.3d 208, 215 (4th Cir. 2002); *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006). Others use a burden-shifting approach, requiring the plaintiff to make out a prima facie case that Rule 4(k)(2) applies, and then requiring a defendant to produce evidence (1) that it could be subject to suit in one or more states, or (2) that exercising jurisdiction under Rule 4(k)(2) would violate the Constitution. *See United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 42 (1st Cir. 1999); *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001), *as amended* (July 2, 2001); *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004); *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005); *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1294 (Fed. Cir. 2012); *Lyngaas v. Curaden AG,* 992 F.3d 412, 422 (6th Cir. 2021).

The Third Circuit has never taken sides in this split. It has said only that once a defendant moves to dismiss in a Rule 4(k)(2) case, the plaintiff "ha[s] the burden of

5

coming forth with competent evidence demonstrating that [the defendant] had sufficient contacts with the United States to justify the court's assertion of … jurisdiction." *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir. 2000). But that language says nothing about whether the plaintiff must affirmatively prove an absence of jurisdiction in all fifty states; it is compatible with cases on either side of the split.

I apply the burden-shifting approach. The weight of out-of-circuit authority supports it. Plus, it makes practical sense, avoiding the difficulties (for courts and litigants alike) of "traips[ing] through the 50 states" each time a plaintiff invokes Rule 4(k)(2). *ISI Intern.*, 256 F.3d at 552; *see also* 4 *Wright & Miller's Federal Practice & Procedure* § 1068.1 (4th ed. 2008 & Supp. 2025) (endorsing burden-shifting approach); Sachs Br. 3–4 (same). Once King raised Rule 4(k)(2), Bon Charge did not argue that it could be sued in any state's courts. In fact, it conceded that it could not, and instead challenged personal jurisdiction on constitutional grounds. D.I. 26 at 5. Given that choice, King had no obligation to show that Bon Charge could not be sued in any state.

As a result, the only prong of Rule 4(k)(2) at issue is whether exercising jurisdiction over Bon Charge would comport with the "United States Constitution and laws." Bon Charge says that exercising personal jurisdiction would violate due process. D.I. 18 at 15; D.I. 26 at 4. King disagrees. D.I. 23 at 9.

### B. Personal jurisdiction is analyzed differently depending on whether the Fifth or Fourteenth Amendment's Due Process Clause applies

In the typical case involving Rule (4)(k)(1)(A), a federal court may assert personal jurisdiction over an out-of-state defendant if (1) the state's long-arm statute covers the defendant's conduct; and (2) jurisdiction would be consistent with the limits

6

imposed by the Fourteenth Amendment's Due Process Clause. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). Those limits are well-established. *See generally Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310 (1945). First, the defendant must have minimum contacts with the state: it must "purposefully avail[] itself of the privilege of conducting activities" there. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Second, the plaintiff's claims must "arise out of or relate to" those activities. *Ford Motor*, 592 U.S. at 359. Third, the exercise of jurisdiction must be fair and reasonable. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Those requirements, the Supreme Court has explained, serve the twin aims of "treating defendants fairly" and "protecting 'interstate federalism.'" *Ford Motor*, 592 U.S. at 360 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980)).

Rule 4(k)(2) works differently. Because it operates independently of any state's long-arm statute, the constitutional analysis turns on the *Fifth* Amendment's Due Process Clause (applicable to the federal government) instead of the *Fourteenth*'s (applicable to the states). *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1296, n.6 (Fed. Cir. 2009). In the years after Rule 4(k)(2) was promulgated, lower courts consistently assumed that the "Fifth Amendment due process test for personal jurisdiction requires the same 'minimum contacts' with the United States as the Fourteenth Amendment requires with a state." *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235, 239 n.4 (5th Cir. 2022) (collecting cases); *see also BP Chems.*, 229 F.3d at 259.

7

*Fuld* upset that assumption. That case involved a federal antiterrorism law that created a civil cause of action for "any U.S. national injured or killed 'by reason of an act of international terrorism'" and provided for "nationwide service of process and venue and exclusive jurisdiction in federal courts." *Fuld*, 606 U.S. at 6–7 (quoting 18 U.S.C. § 2333(a)). In 2019, Congress amended that law to provide that two organizations (including the Palestine Liberation Organization) would "be deemed to have consented to personal jurisdiction" if they engaged in certain conduct in or related to the United States. *Id.* at 8–9 (quoting 18 U.S.C. §§ 2334(e)(1), (5)). The Second Circuit invalidated the amendment for flunking the minimum-contacts standard. *Id.* at 10.

Reversing, the Supreme Court held that "the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard." *Id.* at 23. The Court explained that the Fourteenth Amendment's limits emerged as "a consequence of territorial limitations on the power of the respective States"—a concern not applicable to "the power of the [f]ederal [g]overnment and the corollary authority of the federal courts." *Id.* at 14–15. But the Court declined to describe the "outer bounds" of the federal government's power to authorize the exercise of personal jurisdiction over entities outside of the United States. *Id.* at 18. Instead, it upheld the specific law at issue in *Fuld* as a valid exercise of the government's inherent foreign affairs power, enacted in response to an "urgent objective" (combatting terrorism), applicable to a "narrow category of claims," and triggered by a limited set of activities connected to the United States or its citizens. *Id.* at 20–21.

8

*Fuld* established three principles relevant to Rule 4(k)(2). *First*, whatever standard applies in the Fifth Amendment context is "more flexible" than the standard applicable to the Fourteenth. *Id.* at 16. *Second*, even though the Fifth Amendment does not import the minimum-contacts standard wholesale, the breadth of asserted jurisdiction and the extent of a defendant's contacts with the United States may still be relevant to the constitutionality of asserting jurisdiction in a particular case. *See id.* at 21–22. *Third*, the Fifth Amendment may yet require courts to consider—as they do in Fourteenth Amendment cases—"the reasonableness of the assertion of jurisdiction in the particular case." *Id.* at 23 (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Calif., Solano Cnty.*, 480 U.S. 102, 115 (1987)).

Putting those pieces together, if personal jurisdiction would be constitutional under the pre-*Fuld* nationwide minimum-contacts standard, then jurisdiction is *a fortiori* constitutional under *Fuld. See, e.g., Cent. Am. Bank for Econ. Integration v. Mossi*, 2025 WL 2732731, at *8 (D.D.C. Sept. 25, 2025) ("Any defendant possessing 'sufficient minimum contacts with the relevant forum would also satisfy the more flexible personal jurisdictional standards set forth in *Fuld*.'" (quoting *In re Fairfield Sentry Ltd.*, 671 B.R. 404, 418 (Bankr. S.D.N.Y. 2025))). And jurisdiction is also constitutional in some cases that would have failed the minimum-contacts standard, like *Fuld* itself.

## C. Exercising personal jurisdiction over Bon Charge would be constitutional pre-*Fuld*, so it remains constitutional under *Fuld*

In declining to "delineate the outer bounds of the Federal Government's power … to hale foreign defendants into U.S. courts," *Fuld* "showed commendable restraint."

9

*Fuld*, 606 U.S. at 18 (first quotation); *Axalta Coating Sys. LLC v. FAA*, 144 F.4th 467, 482 (3d Cir. 2025) (Bibas, J., concurring) (second quotation). But it also left important issues for lower courts (like this one) to decide. So I take a cautious approach. Rather than write on a blank slate, I apply pre-*Fuld* case law and conclude that Bon Charge has minimum contacts with the United States, that King's claims relate to those contacts, and that exercising jurisdiction would be fair and reasonable. Since asserting personal jurisdiction over Bon Charge would be constitutional under the more stringent standard *Fuld* rejected, asserting personal jurisdiction is also constitutional under *Fuld*.

*1. Bon Charge has minimum contacts with the United States.* The minimum-contacts standard requires that a defendant "purposefully avail[] itself of the privilege of conducting activities within the forum." *Ford Motor*, 592 U.S. at 359. In the Rule 4(k)(2) context, the relevant forum is the United States. *BP Chems.*, 229 F.3d at 259.

Bon Charge has minimum contacts with the United States. Under the Act, communications made "on behalf of" an entity count as communications made "by" that entity. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). As Bon Charge acknowledges, "[f]rom 2021 until July 2024," it "used PostScript iO, an international company that provides e-commerce brands with SMS text messaging platforms, for automating and sending SMS text messages to individuals in the United States." D.I. 18 at 9 (footnote omitted). And "[i]n July 2024, Bon Charge changed its provider for SMS text messaging … to Klaviyo, a Boston … headquartered company, for SMS text messaging in the United States." *Id.* at 10 (footnote omitted). Those messages flagged

promotions for American holidays and events like Labor Day, the Fourth of July, and Black Friday. Am. Compl. ¶ 21; D.I. 16-1 at 17–18. They also advertised that Bon Charge's products were HSA and FSA eligible, a feature relevant only to American consumers. *Id.* at 45. So since at least 2021, Bon Charge has partnered with marketing companies to send text advertisements targeting potential customers in the United States.

By sending those texts, Bon Charge "purposefully availed itself of" the U.S. market. *Hasson v. FullStory, Inc.*, 114 F.4th 181, 193 (3d Cir. 2024). When a defendant "contact[s] anyone in, or sen[ds] anything or anyone to," a particular forum, those activities can create "jurisdictionally relevant contacts." *Walden v. Fiore*, 571 U.S. 277, 289 (2014); *see also Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993). In *FTC v. Educare Centre Services, Inc.*, for example, Canadian defendants made allegedly misleading telemarketing calls to American consumers. 414 F. Supp. 3d 960, 964–65 (W.D. Tex. 2019). The court concluded that "targeting U.S. consumers with … telemarketing calls amounts to purposeful availment of the forum United States." *Id.* at 969–70. So too here: By sending marketing texts to American customers like King, Bon Charge "made a deliberate decision to target and exploit American markets, thus showing purposeful availment." *Lyngaas*, 992 F.3d at 422.

*2. King's claims are sufficiently related to Bon Charge's contacts to support personal jurisdiction.* A plaintiff's claims must also "derive from, or be connected with," the defendant's activities in the forum. *Goodyear Dunlop Tires Ops., S.A. v.*

11

*Brown*, 564 U.S. 915, 924 (2011). "Even one contact with the forum may be enough to satisfy jurisdiction" so long as the "dispute arises directly out of th[at] contact[]." *Grand Ent. Grp.*, 988 F.2d at 483.

Here, King challenges the legality of Bon Charge's marketing texts—the very communications that constitute purposeful availment. That is often true in TCPA cases, which is why "courts generally find that specific personal jurisdiction exists when a defendant sends a message into the forum state by targeting a phone number in that forum." *Shelton v. Nat'l Gas & Elec., LLC*, 2019 WL 1506378, at *7 (E.D. Pa. Apr. 5, 2019); *see also Mey v. All Access Telecom, Inc.*, 2021 WL 8892199, at *3 (N.D. W. Va. Apr. 23, 2021) (collecting cases). So King's claims are adequately connected to Bon Charge's activities in the United States. *Cf. Fuld*, 606 U.S. at 24 (discussing the "close connection" between the "predicate conduct" that triggered jurisdiction and "the United States").

*3. Exercising jurisdiction over Bon Charge is fair and reasonable.* Finally, the exercise of jurisdiction must be reasonable in a particular case. *Burger King*, 471 U.S. at 476. Jurisdictional reasonableness turns on several factors, including "the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief.*" Asahi,* 480 U.S. at 113; *see also Fuld*, 606 U.S. at 24 (favorably citing these factors). Once a plaintiff shows minimum contacts and a relationship between those contacts and the lawsuit, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

Bon Charge argues primarily that "it would be an incredible burden … to fly back and forth from Perth, Australia, to Delaware" to litigate this case. D.I. 26 at 7. Yet Bon Charge probably would not be burdened that much. It has "hired local counsel," "[d]ocuments can all be exchanged and served electronically," and "[c]ounsel can communicate by video or phone." D.I. 23 at 19; *see also Synthes*, 563 F.3d at 1299 (describing how these steps ease the burdens of litigation). Plus, Bon Charge's founders already travel to the United States to promote their business, suggesting that "travel itself is not unduly burdensome." *Synthes*, 563 F.3d at 1299; *see* Am. Compl. ¶ 14.

Nonetheless, the Supreme Court has instructed that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114. So I assume that forcing Bon Charge to litigate in Delaware would burden it. Even so, the "burden is … outweighed by other factors." *Lyngaas*, 992 F.3d at 422.

For starters, the United States has a significant interest in adjudicating claims under the Act. It "has an interest in enforcing federal laws," including the Act. *Id.* at 423. Plus, the federal government "has an obvious interest in … providing redress for injuries that occurred" on American soil—even if the injury is as trivial as annoyance caused by an unwanted text. *David B. Lilly Co., Inc. v. Fisher*, 18 F.3d 1112, 1119 (3d Cir. 1994) (quoting Restatement (Second) of Conflict of Laws § 145 cmt. d (1971)). Bon Charge does not really dispute that those interests weigh strongly in favor of jurisdiction. *See* D.I. 26 at 8–9.

What is more, King has a significant interest in "obtaining convenient and effective relief." *Volkswagen*, 444 U.S. at 292. Though Bon Charge may be inconvenienced by litigating in Delaware, that inconvenience pales in comparison to the burdens that King would face if she had to litigate in Australia. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1097 (10th Cir. 1998) (noting that this factor may weigh "heavily" where a plaintiff's "chances of recovery will be greatly diminished by forcing him to litigate in another forum because … the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit"). Bon Charge protests that "King has not received any messages from Bon Charge since [it] manually unsubscribed her phone number" in 2024, showing that King "is not in need of immediate and effective relief from U.S. courts." D.I. 26 at 9. But that argument ignores whatever injury was caused by the texts that Bon Charge had already sent. And even if King does not get any more texts from Bon Charge, members of her proposed class might. So King's interest in obtaining convenient and effective relief weighs in favor of exercising jurisdiction.

In sum, jurisdiction would be constitutional under the more exacting pre-*Fuld* standard, so it must remain constitutional post-*Fuld*.

### D. As a matter of first principles, exercising personal jurisdiction over Bon Charge is constitutional

Because this Court has jurisdiction over Bon Charge even under the heightened standard that *Fuld* rejected, the question that *Fuld* left for another day—the "Fifth Amendment's outer limits on the territorial jurisdiction of federal courts"—is not dispositive. 606 U.S. at 19. Nevertheless, considering *Fuld*'s recency, the lack of post-

*Fuld* precedent on point, and the importance of "heed[ing] the text [of the Constitution] … and … interpret[ing] that text according to its ordinary meaning as originally understood," I also look to first principles. *United States v. Rahimi*, 602 U.S. 680, 715 (2024) (Kavanaugh, J., concurring). Doing so, I conclude that exercising jurisdiction over Bon Charge would be consistent with the Fifth Amendment's Due Process Clause as it was understood at the time of its ratification.

*1.  At the Founding, limitations on personal jurisdiction derived from the general law and could be changed by statute.* When the Constitution was ratified, personal jurisdiction was "not a doctrine of due process" at all. Sachs. Br. 10. Instead, it was governed by the general law, a collection of principles "founded on public convenience, and sanctioned by the usage and curtesy of nations." 2 James Kent, *Commentaries on American Law* 102 (New York, O. Halsted 1827). So an American court would enforce a judgment obtained in, say, a French court, only if the judgment "complied with the international rules" limiting a tribunal's power over a defendant or his property. Stephen E. Sachs, Pennoyer *Was Right*, 95 Tex. L. Rev. 1249, 1270 (2017); *see, e.g.*, Joseph Story, *Commentaries on the Conflict of Laws* § 586, at 492 (Boston, Hilliard, Gray & Co. 1834) (noting that if a foreign court lacked "lawful jurisdiction over … the parties," the judgment would be "treated as a mere nullity, having no obligation, and entitled to no respect beyond the domestic tribunals").

The general law similarly governed jurisdictional disputes between the several States. To be sure, the Constitution requires every state to give "Full Faith and Credit" to the "judicial Proceedings of every other State" (a requirement that the Full

15

Faith and Credit Clause's implementing statute extends to "every court within the United States"). U.S. Const. art. IV, § 1 (first two quotations); Act of May 26, 1790, ch. 11, 1 Stat. 122 (codified as amended at 28 U.S.C. § 1738) (third quotation). But courts generally agreed that only judgments "rendered by a court of competent jurisdiction" needed to be afforded full faith and credit. *Aldrich v. Kinney*, 4 Conn. 380, 386 (1822); *see also* Sachs, Pennoyer *Was Right*, at 1278 n.199 (collecting cases). So a Pennsylvania court would not enforce a judgment obtained in Massachusetts that violated (the Pennsylvania court's interpretation of) general-law jurisdictional rules. *See* Sachs, Pennoyer *Was Right*, at 1275 (discussing *Phelps v. Holker*, 1 U.S. (1 Dall.) 261, 264 (Pa. 1788) (opinion of McKean, C.J.)). Nor would a federal court sitting in diversity enforce a state-court judgment obtained in violation of (the federal court's interpretation of) the general law. *See id.* at 1279 (discussing *Flower v. Parker*, 9 F. Cas. 323 (C.C.D. Mass. 1823) (No. 4891) (Story, J.)).

The general law merely provided a collection of default rules, and state legislatures were free to depart from those rules if they wished. *See* Sachs. Br. 10. But the reach of those departures was cabined by the territorial limits of the sovereign power of the state. *See Rose v. Himely*, 8 U.S. (4 Cranch) 241, 276–77 (1808) (Marshall, C.J.). Federal courts, as well as other states' courts, still followed the general law and would refuse to enforce judgments that transgressed its boundaries—unless they were themselves bound by some positive law directing otherwise. *See* Sachs, Pennoyer *Was Right*, at 1285. In that way, state statutes regulating personal jurisdiction operated differently than state statutes regulating

16

other matters; if a state legislature sought to extend personal jurisdiction beyond what the general law allowed, courts elsewhere could disregard the enactment as beyond the state's legislative authority. *See id.* at 1283–84. Only that state's courts were bound by it.

*D'Arcy v. Ketchum* illustrates neatly how this system worked. 52 U.S. (11 How.) 165 (1850). There, a New York statute let courts assert personal jurisdiction over unserved defendants "where joint debtors [were] sued" and "one [was] brought into court." *Id.* at 173. Relying on the statute, a New York court issued a judgment against two business-partner debtors, even though one had not been personally served. *Id.* The plaintiffs then sought to enforce the judgment against the unserved partner in a Louisiana federal court, and the case eventually made it to the Supreme Court. The Court declined to enforce the judgment, citing the "familiar rule" that "countries foreign to our own disregard a judgment merely against the person, where he has not been served with process nor had a day in court," and noting that "national comity is never thus extended." *Id.* at 174. Though New York could adopt a different rule, it was not enforceable anywhere else. Multiple cases from the first half of the nineteenth century adopt similar reasoning. *See* Sachs Br. 11 (citing cases including *Flower*, 9 F. Cas. at 324–26 and *Steel v. Smith*, 7 Watts & Serg. 447, 451 (Pa. 1844)).

Just as New York could order its own courts to depart from the general law governing personal jurisdiction in *D'Arcy*, Congress could order federal courts to depart from the general law. Sachs, Pennoyer *Was Right*, at 1317; Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1722 (2020);

17

*see also The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 145–46 (1812); *The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815). Riding circuit in 1828, Justice Story suggested that Congress might order "a subject of England, or France, or Russia … summoned from the other end of the globe to obey our process, and submit to the judgment of our courts" so long as its intent to do so was "established by irresistible proof," even though such a statute may well violate "principles of public law, public convenience, and immutable justice." *Picquet v. Swan*, 19 F. Cas. 609, 613–14 (C.C.D. Mass. 1828) (No. 11,134); *accord Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 328 (1838) ("concur[ring] with the "substance" of *Picquet*). And the *D'Arcy* Court, though it applied the general law, noted that an act of Congress could "overthrow" the default rule. 52 U.S. (11 How.) at 176; *see also id.* at 174.

But Congress's power to extend personal jurisdiction beyond general-law limits diverged sharply from that of the state legislatures. "[A] state's jurisdictional statutes might have force in its own courts, but they might not apply in other courts." Sachs, *Unlimited Jurisdiction*, 106 Va. L. Rev. at 1721. Congress "faced no such limits." *Id.* at 1722. So long as it was legislating pursuant to an enumerated power, the resulting statute was "supreme Law of the Land." U.S. Const. art. VI, cl. 2. Such a statute would bind any court within its scope, regardless of any general law to the contrary.

*2. The Fourteenth Amendment was originally understood as federalizing general-law rules governing personal jurisdiction in state courts rather than creating new limits.* The ratification of the Fourteenth Amendment in 1868 changed the way that *federal* courts reviewed *state*-court assertions of personal jurisdiction. Before 1868, a plaintiff could bring a diversity action in federal court to enforce a state-court

18

judgment, at which point the federal court could decide whether the judgment was invalid for want of personal jurisdiction. Sachs Br. 13. The Supreme Court could also directly review a state court's refusal to enforce the judgment of another state (or federal) court if it thought that the first court *had* personal jurisdiction (thus making its judgment enforceable under the Full Faith and Credit Clause and its implementing legislation). *Id.*; *see Green v. Van Buskirk*, 72 U.S. (5 Wall.) 307, 314 (1867) (state-court judgment); *Dupasseur v. Rochereau*, 88 U.S. (21 Wall.) 130, 134 (1875) (federal-court judgment).

But after the Fourteenth Amendment, any state court judgment entered without personal jurisdiction deprived the defendant of property without due process, since proceedings against parties "over whom [a] court has no jurisdiction do not constitute due process of law." *Pennoyer v. Neff*, 95 U.S. 714, 733 (1878). So the Supreme Court, which had appellate jurisdiction over state-court judgments implicating federal questions, could directly review any state-court assertion of personal jurisdiction for compliance with the Court's interpretation of the general law. *See* Sachs, Pennoyer *Was Right*, at 1307.

The Fourteenth Amendment had the effect of federalizing personal-jurisdiction standards: If a state court took a different view of the general law than the Supreme Court, then the Court would reverse. To avoid reversal, state courts had to follow the federal view. Sachs, Pennoyer *Was Right,* at 1308; *see, e.g., Belcher v. Chambers*, 53 Cal. 635, 642 (1879). Similarly, state legislatures had to adhere to the federal view if they wanted their legislative enactments regarding personal jurisdiction to be given effect in the federal courts. Sachs, *Unlimited Jurisdiction*, at 1726. The Fourteenth Amendment

19

thus gave "federal *teeth*" to limits that had long existed under the general law. Sachs Br. 13. It was not viewed as creating new, freestanding limits—even though that is how it has been interpreted in a world that has long left the general law behind. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("There is no federal general common law.").

*3. The Fifth Amendment does not itself territorially limit personal jurisdiction in federal court.* The unique interplay between the federal and state judicial systems, coupled with the enactment of the Fourteenth Amendment, explains how state courts' assertions of personal jurisdiction became subject to federal constitutional limits. The Fifth Amendment tells another story.

Around the Founding, the Fifth Amendment played no role in federal courts' review of state-court judgments. If a state-court judgment comported with the general-law limits on personal jurisdiction, then there was no constitutional problem. Sachs, *Unlimited Jurisdiction*, at 1720. And if it did not, the judgment was unenforceable in federal court—not under the Fifth Amendment, but rather under (the federal court's conception of) general law, or because the judgment was not entitled to recognition under the Full Faith and Credit Clause and its implementing statute. *Id.* at 1720–21. The Fourteenth Amendment provided more opportunities for federal courts to review assertions of personal jurisdiction by state courts. But the Fifth Amendment continued to play no part in the analysis.

Historically, the Fifth Amendment was not viewed as limiting federal courts' own assertions of personal jurisdiction either. In decades following the Founding, the issue was purely hypothetical because early statutes did not extend federal courts' jurisdiction

20

beyond the territorial bounds allowed by the general law. Under the first Judiciary Act, for example, "a suit against a U.S. resident had to be heard in the district 'whereof he is an inhabitant, or in which he shall be found at the time of serving the writ'"— requirements that made personal jurisdiction in federal cases "airtight." Sachs, Pennoyer *Was Right*, at 1278 (quoting Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73, 79). Even so, judges acknowledged that Congress could, under its enumerated powers, enact a statute expressly directing federal courts to disregard general-law limits on jurisdiction. *See, e.g.*, *Toland*, 37 U.S. (12 Pet.) at 328; *Picquet*, 19 F. Cas. at 611; *Ex parte Graham*, 10 F. Cas. 911, 912–13 (C.C.E.D. Pa. 1818) (Washington, J.). No contemporaneous commentator invoked the Fifth Amendment as a limit on Congress's authority in that regard, even though "now [would have been] the time to say so." Sachs Br. 13.

To be sure, the Fifth Amendment eventually came to be interpreted as territorially limiting personal jurisdiction in federal court. But that doctrinal shift flowed from the courts' changing conception of the Fourteenth Amendment in the early twentieth century. *Douglass*, 46 F.4th at 262 (Elrod, J., dissenting) ("To imbue the older Fifth Amendment with newer glosses on the more recent Fourteenth Amendment is to put new wine in an old wineskin."). Once courts started viewing the Fourteenth Amendment as imposing its own jurisdictional limits, as opposed to just making the general law's limits enforceable in federal court, it was all too easy to interpose those limits onto the Fifth Amendment in a sort of reverse-incorporation.

*Fuld* cast doubt on the idea that the Fifth Amendment imposes territorial limits on personal jurisdiction without definitively rejecting it. *See Fuld*, 606 U.S. at 26

(Thomas, J., concurring in the judgment). Even so, the historical record is clear: As an original matter, the Fifth Amendment's Due Process Clause did not limit Congress's ability to authorize federal courts to exercise personal jurisdiction over defendants located outside the territorial limits of the United States. So Congress did not violate that Clause when it enacted the Rules Enabling Act and authorized the Supreme Court to promulgate a rule creating personal jurisdiction over defendants not subject to jurisdiction in any state's courts. *See* 28 U.S.C. §2071(a); Fed. R. Civ. P. 4(k)(2). Nor do federal courts violate that Clause when they assert personal jurisdiction over foreign defendants in the manner prescribed by Rule 4(k)(2).

That does not mean that the Due Process Clause imposes no procedural requirements whatsoever. The Supreme Court has long recognized, for example, that "'due process of law' generally implies and includes … regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 280 (1856); *see also Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (describing the touchstones of procedural due process as notice and the opportunity to be heard). But Bon Charge does not raise other due process arguments. So I simply conclude, based on the historical record, that the Fifth Amendment does not limit the nationwide service-of-process authorized by Rule 4(k)(2). Sachs Br. 14–15.

\* \* \* \* \*

Because exercising personal jurisdiction over Bon Charge would be constitutional under the minimum-contacts standard that *Fuld* rejected, it is also constitutional

22

under *Fuld*'s "more flexible" standard. *Fuld*, 606 U.S. at 16. Plus, exercising personal jurisdiction over Bon Charge is constitutional under the Fifth Amendment as originally understood. For those reasons, I deny Bon Charge's motion to dismiss for lack of personal jurisdiction.

### III.    I DISMISS IN PART FOR FAILURE TO STATE A CLAIM

Having assured myself that this Court has personal jurisdiction, I now proceed to Bon Charge's motion to dismiss King's amended complaint for failing to state a claim under the TCPA.

The Act delegates to the Federal Communications Commission the authority to craft rules to "protect residential telephone subscribers' privacy rights." 47 U.S.C. § 227(c). Exercising that authority, the FCC has established a national Do-Not-Call Registry and promulgated regulations that, among other things, bar advertisers from contacting numbers on the Registry or contacting residential telephone subscribers before 8 a.m. or after 9 p.m. local time. *See* 47 C.F.R. § 64.1200(c)(1)–(2); *see also Seri v. Crosscountry Mortg., Inc.*, 2016 WL 5405257, at *6 (N.D. Ohio Sept. 28, 2016) ("47 C.F.R. § 64.1200(c) is a regulation promulgated under § 227(c).").

Section 227(c)(5) of the TCPA lets plaintiffs sue for violations of the FCC's privacy regulations and get an injunction or damages. *See* 47 U.S.C. § 227(c)(5)(A)–(B); *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Normally, plaintiffs are entitled to no more than $500 per violation. § 227(c)(5)(B). But if a court finds that the defendant "willfully or knowingly violated the regulations," it may award up to $1,500 per violation. § 227(c)(5). King asserts three counts under the TCPA, each of which

23

seeks both damages and injunctive relief. *See* Am. Compl. ¶¶ 72–89. I let the second count proceed and dismiss the first and third counts without prejudice.

### A. King states a claim that Bon Charge improperly contacted her after she listed her number on the Do-Not-Call Registry

In Count II, King says that Bon Charge flouted 47 C.F.R. § 64.1200(c)(2), which bars advertisers from "initiat[ing] any telephone solicitation to … [a] residential telephone subscriber who has registered his or her telephone number" on the Do-Not-Call Registry. To state a claim for violating that regulation under § 227(c)(5), King "must plead that (1) [she] receive[d] multiple calls within twelve months, (2) by or on behalf of the same entity, (3) on a residential phone registered on the [Do-Not-Call Registry]." *Camunas v. Nat'l Republican Senatorial Comm.,* 541 F. Supp. 3d 595, 604 (E.D. Pa. 2021); *see also* 47 U.S.C. § 227(c)(5). A text message counts as a "call." *See Shelton v. Pro Source Lending Grp. LLC*, 2025 WL 817485, at *4 n.4 (E.D. Pa. Mar. 14, 2025); *cf. Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) (text messages count as "calls" under TCPA's parallel provisions prohibiting robocalls).

King's amended complaint satisfies all three elements. According to the complaint, King registered her cell phone number on the Do-Not-Call Registry around February 23, 2022. Am. Compl. ¶ 51. But she got "dozens of telemarketing text messages from [Bon Charge] more than 30 days after her telephone number was registered." *Id.* ¶ 52; *see also* D.I. 16-1 at 13–20 (texts from April 2022 onward). Finally, King says she uses her cell phone number as a residential line. *Id.* ¶ 50; *see Jackson v. Direct Bldg. Supplies LLC*, 2024 WL 184449, at *4–8 (M.D. Pa. Jan. 17,

24

2024) (holding that alleging that a cell phone number on the Do-Not-Call Registry is a "residential telephone" line is enough to avoid dismissal).

In its motion to dismiss, Bon Charge argues that King subscribed to marketing messages from Bon Charge back in 2021, before the messages underlying this case were allegedly sent. The Act defines "telephone solicitation[s]" to exclude "call[s] or message[s] … to any person with that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4). So a defendant will not be liable for contacting someone on the Do-Not-Call Registry if a plaintiff has previously given the defendant permission to reach out. *See* 47 C.F.R. § 64.1200(c)(2)(ii).

But Bon Charge demands more than the TCPA requires at the pleadings stage. "[W]hile the Third Circuit has not explicitly addressed" the matter, "it has, in dicta, signaled … that consent (or its absence) is not an element but an affirmative defense, and therefore, it is not the plaintiff's burden to pre-rebut it in order to avoid dismissal" *Zelma v. Wonder Grp. Inc.*, 2025 WL 2976546, at *3 (D.N.J. Oct. 22, 2025) (cleaned up) (citing *Evankavitch v. Green Tree Serv., LLC*, 793 F.3d 355, 366 (3d Cir. 2015)). So I may dismiss Count II only if the complaint and its exhibits, or undisputedly authentic "matters incorporated by reference or integral to the claim," support an inference that there was consent. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 527 (8th Cir. 2017) (quoting 5B *Wright & Miller's Federal Practice & Procedure* § 1357 (3d ed. 2004)).

King's amended complaint contains an exhibit consisting of phone records, which show that King sent a message to Bon Charge "subscri[bing]" to marketing texts in 2021. D.I. 16-1 at 2. Bon Charge highlights that exhibit in its motion to dismiss,

25

arguing that it establishes consent. D.I. 18 at 25. But because of a quirk in the Act's implementing regulations, this exhibit reveals nothing about whether Bon Charge secured King's "prior express invitation or permission" to send her texts after she signed up for the Do-Not-Call Registry in 2022.

Generally, the term "express invitation or permission," as used in the Act and the regulations implementing it, means "express consent." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 621 (3d Cir. 2020). Express consent exists if a person "knowingly release[s] [her] phone number[]" to the sender, and the sender subsequently sends messages that are "related to why the number was provided." *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 389 (3d Cir. 2017) (first quotation); *Physicians Healthsource*, 954 F.3d at 622 (second quotation). Under the Act, this "express invitation or permission" does not have to be in writing. *See* 47 U.S.C. §227(a)(5).

But under the TCPA's implementing regulations, "prior express invitation or permission" in the context of the Do-Not-Call Registry must be evidenced by a "*signed, written* agreement between the [plaintiff] and [defendant] which states that the [plaintiff] agrees to be contacted by this [defendant] and includes the telephone number to which the calls may be placed." 47 C.F.R §64.1200(c)(2)(ii) (emphases added). That regulatory provision effectively broadens the statutory definition of "telephone solicitation" for Do-Not-Call Registry claims, narrowing the class of calls or messages that are exempt from the Act's reach due to the recipient's consent. I have doubts about the provision's faithfulness to the statutory text. *Cf. Dobronski v.*

26

*Tobias & Assocs., Inc.*, 769 F. Supp. 3d 681, 695 n.2 (E.D. Mich. 2025) (noting the uneasy fit between the statutory definition of "telephone solicitation," which the regulations generally apply, and the Do-Not-Call Registry regulations). But Bon Charge has not challenged its validity, so at least for now, I apply the regulatory definition.

The amended complaint contains no information about what, if anything, was shown to King before she texted Bon Charge. *See* D.I. 23 at 25. Nor does it describe any written agreement between the parties about marketing messages. The exhibits attached to it do not contain that information either. So the existence of "prior express invitation or permission" that satisfies the regulatory requirements is not obvious from the allegations in the complaint, the exhibits attached to it, or any other document integral to the claim.

That missing information makes King's case different from another recent case that was dismissed for lack of standing after the parties stipulated to facts showing clear consent—and thus the absence of a cognizable injury in fact. *Winner v. Kohl's Department Stores, Inc.*, 2017 WL 3535038, at *6–7 (E.D. Pa. Aug. 17, 2017); *see also* D.I. 18 at 23–24 (invoking *Winner* as a ground to dismiss). And though Bon Charge flags two more cases involving consent that it says support dismissal, both cases involved different provisions of the Act and regulations that, at the time, did not require consent to be in writing. *See* D.I. 18 at 24 (discussing *Blow v. Bijora, Inc.*, 855 F.3d 793, 804 (7th Cir. 2017) and *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1046 (9th Cir. 2017)).

27

As the litigation goes forward, Bon Charge will have a chance to show that King gave "prior express invitation or permission" in writing to receive marketing messages. But I may not dismiss King's claims just because there is a chance that Bon Charge might make out an affirmative defense down the line. Count II may proceed.

### B. I dismiss King's standalone treble-damages claim

King's Count I is substantively identical to Count II, except that it further alleges that Bon Charge's "violations were willful and knowing," warranting "up to $1,500" in damages per violation. Am. Compl. ¶¶ 74–75. But "the possibility of treble damages … is not a separate cause of action; it is simply an enhancement of the damages available for a violation" of § 227(c)(5) in cases where the defendant has acted willfully or knowingly. *Picton v. Greenway Chrysler-Jeep-Dodge, Inc.*, 2019 WL 2567971 (M.D. Fla. June 21, 2019) (reaching this conclusion in the context of the similarly worded private right of action at 47 U.S.C. § 227(b)(3)). As a result, I dismiss Count I without prejudice. King may amend Count II to clarify that she seeks enhanced as well as standard damages.

### C. I dismiss King's quiet-hours claim

In Count III, King says that she received texts from Bon Charge "before 8:00 a.m. or after 9 p.m." in violation of the so-called "quiet hours" provision of the TCPA's implementing regulations. Am. Compl. ¶ 86; *see* 47 C.F.R. § 64.1200(c)(1); Harrison Brown et al., *Tick-Tock, Don't Get Caught: Navigating TCPA's Quiet Hours*, Nat'l L. Rev. (Mar. 31, 2025) [https://perma.cc/X4K6-FH8G]. At the outset, King asserts this count under 48 U.S.C. § 227(c)(2), the provision of the Act delegating to the FCC the authority to make rules to "protect residential telephone subscribers' privacy rights."

28

Am. Compl. ¶ 41. But § 227(c)(2) is not a private right of action; the only private right of action to enforce regulations promulgated under subsection (c) is located at § 227(c)(5). So King must satisfy § 227(c)(5) to state a claim based on the quiet-hours provision. Specifically, King must plead that she (1) got multiple calls (or texts) within twelve months, (2) by or on behalf of the same entity, (3) on a residential phone (4) before 8 a.m. or after 9 p.m. local time. *See* 47 U.S.C. § 227(c)(5); *Jubb v. CHW Grp., Inc.*, 2025 WL 942961, at *3 (D.N.J. Mar. 28, 2025).

At first glance, King's amended complaint seems to satisfy all four elements. She adequately alleges that she uses her cell phone as a residential line. *See supra* Part III.A; Am. Compl. ¶ 50. And she claims that she received multiple texts from Bon Charge between 9 p.m. and 8 a.m. local time over the course of more than twelve months. *See, e.g.*, D.I. 16-1 at 7 (text sent on May 18, 2021 at 3:45 a.m. UTC—that is, on May 17 at 11:45 p.m. EDT), 19 (text sent on February 28, 2024 at 3:31 a.m. UTC— that is, on February 27 at 10:31 p.m. EST); *see also* Am. Compl. ¶ 55 (noting that the timestamps in D.I. 16-1 "are in Coordinated Universal Time (UTC)"); *id.* ¶ 86 (alleging that King's area code was in the "Eastern U.S. time zone," that King "resid[ed] in Smyrna, Delaware at all relevant times" and that she was "physically present in Delaware at all relevant times, apart from one day trip to Philadelphia" in 2021).

But King's quiet-hours claim runs into a problem with consent. Like the Do-Not-Call Registry provision of the FCC's regulations, the quiet-hours provision applies only to "telephone solicitation[s]," which both the Act and regulations define as "telephone call[s] or message[s]" made without the recipient's "prior express

29

invitation or permission." *See* 47 C.F.R. §64.1200(c) (first quotation); *compare id.* §64.1200(f)(15)(1), *with* 47 U.S.C. §227(a)(4) (second and third quotations). But unlike the Do-Not-Call Registry provision, the quiet-hours provision does not require a person's "prior express invitation or permission" to be "evidenced by a signed, written agreement" that meets certain requirements. *Compare* 47 C.F.R. §64.1200(c)(2)(ii) (specifying the "signed, written agreement" exception), *with id.* §64.1200(c)(1) (no such language). Instead, the general definition of "express invitation or permission" as "express consent" applies. *See Physicians Healthsource*, 954 F.3d at 621. Prior express consent does not require a writing; rather, an individual can provide it by "knowingly releas[ing] [her] phone number[]" to the sender. *Daubert*, 861 F.3d at 389.

Here, the phone records attached to King's complaint reveal that she "knowingly release[ed]" her phone number to Bon Charge by sending it a message to "subscribe" to marketing texts and get a "15 percent off coupon." D.I. 16-1 at 2. That counts as prior express consent to get messages advertising Bon Charge's products—messages that were undisputably related to "why the number was provided." *Physicians Healthsource*, 954 F.3d at 622; *see also Blow*, 855 F.3d at 803 (concluding that the plaintiff gave prior express consent to get marketing messages when she "provided her phone number to [the defendant] to receive discounts"); *Van Patten*, 847 F.3d at 1046 (concluding that the plaintiff gave prior express consent to get messages inviting him to reactivate gym membership when he provided his phone number as part of the member-registration process). To be sure, King alleges that she "never consented … to receive telemarketing

30

calls or text messages" from Bon Charge. Am. Compl. ¶ 48. But that conclusory assertion runs headlong into the phone records attached to King's own amended complaint, and I do not have to assume its truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

As far as the quiet-hours claim goes, King's prior express invitation or permission is "apparent from the face of the [amended] [c]omplaint." *Zean*, 858 F.3d at 525. So the texts Bon Charge sent were not "telephone solicitation[s]," and the quiet-hours provision does not apply. King has failed to state a claim for a violation of that provision and I dismiss Count III. Again, I do so without prejudice so that King may amend her complaint if she so chooses.

* * * * *

This Court has personal jurisdiction over Bon Charge. And King has stated a claim that Bon Charge violated the FCC's ban on contacting individuals on the Do-Not-Call Registry. King has not stated a standalone claim that Bon Charge's violation was willful, because the TCPA does not provide a separate cause of action for "willful" or "intentional" violations. Nor has King stated a claim that Bon Charge violated the FCC's quiet-hours rule. So I let Count II proceed and dismiss Counts I and III. But I grant King leave to amend her complaint.

31